14-1153

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SHELLY CONTE AND CINDY REICHMAN

Plaintiffs-Appellants

v.

JAKKS PACIFIC, INC.

Defendant-Appellee

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF CALIFORNIA IN 12-cv-00006-LJO-GSA
JUDGE LAWRENCE J. O'NEILL

---

BRIEF OF PLAINTIFFS-APPELLANTS SHELLY CONTE
and CINDY REICHMAN; AND ADDENDUM

LENDEN F. WEBB
WEBB & BORDSON, APC
466 West Fallbrook Avenue, Suite 102
Fresno, California 93711
Telephone: (559) 431-4888
Facsimile: (559) 821-4500

Attorneys for Plaintiffs-Appellants

February 7, 2014

**Form 9**

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Shelly Conte and Cindy Reichman v. Jakks Pacific, Inc.

No. 14-1153

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ (appellant) ~~(respondent)~~ ~~(appellee)~~ ~~(amicus)~~ (name of party)
Lenden F. Webb _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Shelly Conte and Cindy Reichman

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. ☐  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

None

February 6, 2014
Date

/s/ Lenden F. Webb
Signature of counsel

Lenden F. Webb
Printed name of counsel

Please Note: All questions must be answered
cc: William T. McLaughlin, Lang Richert & Patch

# **TABLE OF CONTENTS**

I.     STATEMENT OF RELATED CASES ……………………… 1

II.    STATEMENT OF JURISDICTION ………………………… 1

III.   STATEMENT OF ISSUES ………………………………… 1

IV.    STANDARD OF REVIEW ………………………………… 2

V.     STATEMENT OF THE CASE ……………………………… 2

    A.   Factual Background for Appellants' Patent Infringement

       Claims ……………………………………………….. 2

       1.   Appellants' Patent ………………………………… 2

          a.   The Invention ………………………………… 2

          b.   Appellants' Hide-N-Seek Hayley ……………… 3

       2.   Jakks' Infringing Care Bear Doll …………………… 4

    B.   The Procedural History of Appellants' Infringement

       Lawsuit ……………………………………………… 5

       1.   The Complaint …………………………………… 5

       2.   The Motions at Issue …………………………….. 6

       3.   The Court's Ruling on the Motions ………………… 6

       4.   The Judgment …………………………………… 7

VI.    SUMMARY OF ARGUMENT ……………………………… 7

    A.   The Court Erroneously Found the Patent Invalid as

       Obvious ……………………………………………… 7

    B.   The Court Erroneously Found that Jakks' Care Bear

       Doll Did Not Infringe on the '457 Patent ………………... 7

    C.   The District Court Abused its Discretion in Denying

       Leave to Amend …………………………………… 9

VII.   ARGUMENT ……………………………………………… 9

    A.   The '457 Patent is Not Invalid as Obvious ………………… 10

       1.   The '457 Patent is Presumed to be Valid …………….. 10

2.  The Invalidity of a Patent Must be Proven by Clear and Convincing Evidence ……………………………. 11

3.  The *Graham* Analysis Results in the '457 Patent Not Being Invalid as Obvious ……………………………… 12

    a.  The Invention of the '457 Patent Claim …………. 12

    b.  The Differences Between the Claimed Art and the Prior Art Establish the Validity of the '457 Patent .. 13

        i.  The Friedman Patent is Grounded on Wholly Different Technology ……………………… 14

        ii.  The Invention of the Friedman Patent Wholly Defeats the Purpose of the Invention of the '457 Patent ………………………………… 17

    c.  The Other *Graham* Factors Support the Validity of the '457 Patent ……………………………… 18

        i.  The Court's Assessment as to the Level of Ordinary Skill in the Art was Erroneous … 18

            a.  The Hosny Patent's Technology is Less Sophisticated ………………………… 18

            b.  The '457 Patent's Use of Known Technology Does not Render the Invention Rudimentary ……………… 20

        ii.  The Court's Assessment of the Secondary Considerations was Erroneous ……………… 20

B.  Jakks' Care Bear Doll Directly Infringes on the '457 Patent ……………………………………………………… 22

    1.  The Care Bear Doll Literally Infringes on the '457 Patent ……………………………………………… 22

        a.  The District Court Misconstrued Claim 9 ………. 23

b.  The '457 Patent Does Not Require the User Be
Alerted as to His or Her Distance From the Doll
Every Time the User Moves …………………….. 25

c.  The Care Bear Doll Continuously Determines the
User's Relative Distance from the Doll …………. 26

d.  Whether the Care Bear Doll Infringes on
another Patent is Wholly Irrelevant …………… 27

2.  The Care Bear Doll Infringes on the '457 Patent Under
the Doctrine of Equivalents ………………………… 28

C.  The District Court Wrongly Denied Appellant's Motion
for Leave to Amend Their First Amended Complaint ……. 30

1.  Any Prejudice to Jakks Failed to Justify the Denial
of the Motion ……………………………………….. 31

a.  The Patent Claims Appellants Seek to Add Are
Already At Issue ………………………………… 31

b.  The Addition of the New Claims Appellants Seek
to Add Will Not Cause Grave Injustice to Jakks ….. 33

2.  The Amendment Would Not Be Futile ……………… 34

a.  The '457 Patent is Not Invalid as Obvious ………. 34

b.  The Care Bear Doll Infringes on the '457 Patent … 35

3.  Appellants' Delay Should Not Prevent the
Amendment …………………………………………… 35

4.  The Additional Factors Considered by the Court
Do Not Justify Denying the Motion …………………… 36

VIII.    CONCLUSION ……………………………………. 37

Addendum 1:    Order on Motions for Summary Judgment and Motion
for Leave to Amend the First Amended Complaint

Addendum 2:        Judgment

Addendum 3:        United States Patent No. 6,494,457

# TABLE OF AUTHORITIES

## CASES

**Federal Circuit Appeals:**                                              **Page(s)**

*Alpex Computer Corp. v. Nintendo Co. Ltd*
    102 F.3d 1214 (Fed. Cir. 1996) …………………………….    28

*Alza Corp v. Mylan Labs., Inc.*
    464 F.3d 1286 (Fed. Cir. 2006) …………………………..    2

*Baker v. Pacific Far East Lines, Inc.*
    451 F.Supp. 84 (N.D. Cal. 1978) ………………………….    35

*Best Canvas Products & Supplies, Inc. v. ploof Truck Lines, Inc.*
    713 F.2d 618 (11th Cir. 1993) …………………………..    31

*Conroy v. Reebok Int'l, Ltd.*
    14 F.3d 1570 (Fed. Cir. 1994) …………………………..    10

*Cybor Corp. v. FAS Techs., Inc.*
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) …………………    22, 28

*Dussouy v. Gulf Coast Investment Corp.*
    660 F.2d 594 (5th Cir. 1991) ………………………………..    31

*Hip Hop Beverage Corp. v. RIC Represencoes Importacao*
*E comercio Ltda*
    220 F.R.D. 614 (C.D. Cal. 2003) ….…………………..    33

*Kemco Sales, Inc. v. Control Papers Co.*
    208 F.3d 1352 (Fed. Cir. 2000) ……………………………    28

*Loctite Corp. v. Ultraseal, Ltd*
    781 F.2d 861 (1985) ………………………………………    12, 21

*Loehr v. Ventura County Community College Dist*
    743 F.2d 1310 (9th Cir. 1984) …………………………..    36

*Miller v. Rykoff-Sexton, Inc.*
  845 F.2d 209 (9th Cir. 1988) ………………………………. 35

*Mooney v. City of New York*
  219 F.3d 123 (CA2, NY 2000) ……………………………. 32, 33

*Morongo Band of Mission Indians v. Rose*
  893 F.2d 1074 …………………………………………….. 36

*Nielson v. Armstrong Rubber Co*
  570 F.2d 272 (8th Cir. 1978) ………………………………. 2

*Panduit Corp. v. Dennison Mfg. Co.*
  810 F.2d 1561 (Fed. Cir. 1987) ……………………………. 12

*Patton v. Guyer*
  443 F.2d 79 (CA10 Kan. 1971) ……………………………. 33

*Phoenix Solutions, Inc. v. Sony Electronics, Inc.*
  637 F.Supp.2d 683 (N.D. Cal. 2009) ………………………. 36

*Ranbaxy Pharms., Inc. v. Apotex, Inc.*
  350 F.3d 1235 (Fed. Cir. 2003) ……………………………. 22

*Reeves Instrument Corp. v. Beckman Instruments, Inc.*
  444 F.2d 26 (1971) ………………………………………….. 12, 17, 20

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*
  859 F.2d 878 (Fed. Cir. 1988) ……………………………. 22

*Shipner v. Eastern Airlines, Inc.*
  868 F.2d 401 (11th Cir. 1999) ………………………………. 31

*Thorner v. Sony Computer Entm't Am., LLC*
  669 F.3d 1362 (Fed. Cir. 2012) ……………………………. 12, 13

*Veritas Operating Corp. v. Microsoft Corp*
  562 F.Supp.2d 1141 (W.D. Wash. 2008) …………………... 22

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*
  721 F.2d 1540 …………………………………………………. 15

*Wilson v. Bruks-Klockner, Inc.*

    602 F.3d. 363 (5th Cir. 2010) …………………………………    2


**United States Court of Appeals:**                                        **Page(s)**

*Anderson v. City of Bessemer City*

    470 U.S. 564 (1985) …………………………………………    2

*Forman v. Davis*

    371 U.A. 178 (1962) ………………………………………….    31

*Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*

    33 U.S. 605 …………………………………………………    29

*Graham v. John Deere Co. of Kansas City*

    383 U.S. 1 (1966) …………………………………………...    11, 12,  13

                                                                                          18, 20, 21

*Microsoft Corp. v. i4i Ltd. P'ship*

    131 S.Ct. 2238 (2011) …………………………………………    11, 22

*Mooney v. City of New York*

    531 U.S. 1145 (Cert. Den. 2001)……………………………    32, 33

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*

    117 S.Ct. 1040 (1997) …………………………………………    28


**STATUTES**

**United States Code**                                                       **Page(s)**

28 U.S.C. §1295(a)(1) ………………………………………..    1

28 U.S.C. §1331 …………………………………………………    1

28 U.S.C. §1338(a) ……………………………………………    1

35 U.S.C. §103 ……………………………………………….    1, 12, 16

                                                                                          20

35 U.S.C. §282 ………………………………………………    10, 11

# RULES

| **Federal Circuit Rules** | **Page(s)** |
|---|---|
| Fed Cir Rule 47.5 ……………………………………………. | 1 |

**Federal Rules of Civil Procedure**

| | |
|---|---|
| Fed. R. Civ. P. 56(c) …………………………………………. | 10 |
| Fed. R. Civ. P. 15(a) …………………………………………. | 30, 33 |

# I.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellants SHELLY CONTE and CINDY REICHMAN (collectively "Appellants") provide as follows:

(a)    There have been no previous appeals in this case.

(b)    Appellants are aware of no other case that will be directly affected by the Court's decision in this case.

# II.    STATEMENT OF JURISDICTION

This case involves the validly and infringement of United States Patent No. 6,494,457 (the " '457 patent") issued to Appellants.  The district court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

On November 5, 2013, the district court issued its Order on Motions for Summary Judgment and Motion for Leave to Amend the First Amended Complaint, granting Appellee JAKKS PACIFIC INC. ("Appellee" or "Jakks") Motion for Summary Judgment and denying Appellants' Motion for leave to file their proposed Second Amended Complaint.

On November 5, 2013, the district court entered Judgment in favor of Jakks and against Appellants as to each cause of action in Appellants' First Amended Complaint, based on its November 5, 2013 Order.

On December 4, 2013, Appellants timely filed their Notice of Appeal. The Federal Circuit has jurisdiction of this appeal under 28 U.S.C. § 1295(a)(1).

# III.    STATEMENT OF ISSUES

• Did the district court err in finding that the '457 Patent is invalid as obvious under 35 U.S.C. § 103?

• Did the district court err in finding that Jakks's product does not infringe literally on the '457 Patent?

• Did the district court err in finding that Jakks' product does not infringe under the Doctrine of Equivalents on the '457 Patent?

• Did the district court abuse its discretion in denying with prejudice

Appellants' Motion for Leave to Amend the First Amended Complaint?

## IV.    STANDARD OF REVIEW

Obviousness is a question of law, reviewed de novo, based upon underlying factual questions, which are reviewed for clear error.  *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1289 (Fed. Cir. 2006).  Likewise, for patent infringement, an appellate court may set aside the district court's factual findings if they are "clearly erroneous."  The United States Supreme Court explained that "[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed...." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (citations omitted).

As to a district court's denial of leave to amend a complaint, the appellate court reviews the denial under an "abuse of discretion" standard. *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 276 (8th Cir. 1978); *Wilson v. Bruks-Klockner, Inc.* 602 F.3d. 363, 368 (5th Cir. 2010).

## V.    STATEMENT OF THE CASE

**A.    Factual Background for Appellants' Patent Infringement Claims**

**1.    Appellants' Patent**

Appellants are the lawful owners of all rights, title, and interest in the '457 Patent issued by the United States Patent and Trademark Office on December 17, 2002.  The invention of the '457 Patent is an enhanced hide and seek game. A1696.

**a.    The Invention**

As detailed in the '457 Patent, the hide and seek game comprises a doll with a transmitter device. The transmitter device is capable of transmitting a signal to a seeker unit, which is a hand-held device used by the game participant.  The seeker unit contains a receiver capable of receiving the signal from the transmitter device, and a voice activated sensor, a speaker, and associated microprocessor circuitry.

A1700-A1704.

The seeker unit's microprocessor is suitable for determining a relative change in distance as to the seeker unit and the doll based on the strength of the signals received from the transmitter unit. In particular, the seeker unit receives a signal from the transmitter in the doll and determines a first distance between the participant and the doll, a subsequent distance between the participant and the doll, and a relative change in the distance. With respect to the determination of these distances, the '457 Patent specially states:

> *It is not necessary that seeker unit 14 of the present invention 10 be able to calculate the actual distance* (i.e., in feet and/or inches) between object 12 and participant 16. Instead, it is only necessary that seeker unit 14 be able *to measure the relative strength of signal 34, with the weaker signals* 34 indicating seeker unit 14 (and therefore participant 16) is further away from object 12 and stronger signals 34 indicated participant 16 is closer to object 12. A1702, ¶5 (emphasis added).

Accordingly, the seeker unit only needs to determine the participant's relative proximity from the doll based on the strength of the signals from the transmitter unit. The seeker unit then plays an audio message to cue the participant as to his or her relative proximity from the doll. A1700-A1704.

### b. Appellants' Hide-N-Seek Hayley

Appellants have developed, manufactured and distributed merchandise embodying the invention of the '457 Patent, namely the "Hide-N-Seek Hayley" interactive doll (the "Hayley Doll"). As called for by the invention of the '457 Patent, a transmitter is inside the Hayley Doll. The game participant uses a hand-held seeker device that determines the participant's relative proximity from the doll based on the strength of the signals its receives from the transmitter. A127-A128; A23-A24.

The seeker unit for the Hayley Doll emits both audio and light signals to cue the participant as to his or her relative proximity to the doll. In particular, the

Hayley Doll relies on three predetermined distance ranges to trigger certain messages and light signals unique to each of the three ranges. For instance, when the participant is in a relatively far range from the doll, messages unique to this range are played, such as "hurry, come find me." When the participant is closer, messages unique to this range are played, such as "you're getting warmer." When the participant is essentially at the doll, the message "you found me" is played. A127-A128.

As part of Appellants' marketing scheme, in or about 2003, Appellants contacted Play Along Toys, a subsidiary of Jakks, via telephone to market the Hayley Doll concept. Among other things, Appellants submitted website information containing demonstrations of the Hayley Doll concept to Play Along Toys. No deal ever transpired. A24.

## 2. Jakks' Infringing Care Bear Doll

In or about 2005, Jakks, through its subsidiary company, Play Along Toys, began manufacturing and marketing Care Bear dolls under a license from the owner of the Care Bears trademark. In particular, Jakks markets Care Bear dolls known as the "Hide 'N Seek Secret Bear" and the "Hide 'N Seek Surprise Bear" dolls (collectively the "Care Bear Doll"). A201-A204; A279.

Like the Hayley Doll, the Care Bear Doll is an enhanced hide and seek game. Inside the Care Bear Doll is a transmitter, which transmits a signal outward from the doll. The game participant uses a hand-held seeker unit, which has a receiver capable of receiving the signal from the transmitter in the doll. The receiver has a remote control decoder block, which decodes the signal from the transmitter and utilizes two digital output signals, referred to as the FW signal and BW signal. The FW and BW signals are activated by the strength of the signal from the transmitter unit. A93-A97; A106-A126; A260-A265; A284-A309.

The FW and BW signals go to a central processing unit ("CPU"). The CPU reads the FW and BW signals to determine how far the seeker unit is from the

transmitter inside the Care Bear Doll.  When neither the FW signal nor the BW signal are activated, the CPU makes the determination that the seeker unit is far away (over approximately 20 feet away) from the transmitter unit (hereinafter "FAR").  When the FW signal is activated and the BW signal is not activated, the CPU makes the determination that the seeker unit is within a closer range (approximately 3 feet to 20 feet away) to the transmitter unit (hereinafter "NEAR"). When both the FW signal and BW signal are activated, the CPU determines that the seeker unit is very close (under approximately 3 feet) from the transmitter unit (hereinafter "CLOSE PROXIMITY").  A93-A97; A106-A126; A260-A265; A284-A309.

A speaker and a light indicator are attached to the CPU. When the seeker unit is FAR, the CPU causes the light indicator to blink approximately once per second and voice messages to emit from the speaker.  The voice messages are particular to the FAR distance and are played in a random order, such as "you're cold." When the seeker unit is NEAR, the CPU causes the light indicator to double-blink once every 2 seconds and voice messages to emit from the speaker. The voice messages are particular to the NEAR distance and are played in random order, such as "you are getting warmer." When the seeker unit is CLOSE PROXIMITY, the CPU causes the light indicator to blink on and off approximately twice per second and a voice message to emit from the speaker, stating "Hurray you found me." A93-A97; A106-A126; A260-A265; A284-A309.

**B.    The Procedural History of Appellants' Infringement Lawsuit**

**1.    The Complaint**

Appellants discovered Jakks' Care Bear Doll and, on January 3, 2012, filed their original complaint against Jakks for infringement on their '457 Patent.  On April 3, 2012, Appellants filed their First Amended Complaint, which is the operative complaint. A21.

In their First Amended Complaint, Appellants asserted their claims against

Jakks for direct infringement and indirect infringement of the '457 Patent. A21. On June 19, 2012, the district court granted in part and denied in part Jakks' motion to dismiss Appellants' First Amended Complaint. The court denied Jakks' motion as to the direct infringement claims and granted the motion as to the indirect infringement claim. Thereafter, on August 13, 2012, Jakks filed an answer to the First Amended Complaint. A43.

### 2.    The Motions At Issue

On August 29, 2013, Appellants filed their Motion for Summary Judgment as to Jakks' Care Bear Doll's direct infringement on the '457 Patent. A56. One day later, on August 30, 2013, Jakks filed its Motion for Summary Judgment. A214.

In particular, Jakks asserted, in its Motion, that the '457 Patent was invalid as obvious and that the Care Bear Doll did not infringe, literally or under the Doctrine of Equivalents, on the '457 Patent. A216.

### 3.    The Court's Ruling on the Motions

On October 29, 2013, Appellants filed a motion for leave to amend their First Amended Complaint. A1634. Appellants sought to include, among other things, all of the claims of the '457 Patent in their operative pleading as the district court questioned whether Appellants' First Amended Complaint alleged infringement of all of these claims, as opposed to just one claim (Claim 9).

On November 5, 2013, the district court issued its Order on Motions for Summary Judgment and Motion for Leave to Amend the First Amended Complaint. A1. The district court granted Jakks' Motion for Summary Judgment and denied Appellants' Motion for Summary Judgment, finding the '457 Patent was invalid as obvious and that the Care Bear Doll did not infringe on the '457 Patent. A5-A13.

The district court further denied Appellants' Motion for Leave to Amend, finding that such amendment would cause undue prejudice to Jakks, would be

futile, would not promote judicial economy, and that Appellants unduly delayed in seeking leave to amend.  A13-A18.

### 4.    The Judgment

That same day and based on its November 5, 2013 Order, the district court entered Judgment in favor of Jakks and against Appellants as to each cause of action in Appellants' First Amended Complaint.  A20.  Appellants hereby appeal that Judgment, and the November 5, 2013 Order upon which it is based.

## VI.    SUMMARY OF ARGUMENT

The district court's granting of Jakks' Motion for Summary Judgment was erroneous.  ***Throughout its findings***, the district court misconstrued the claims of the '457 Patent and solely focused on ***an element*** of Claim 9 of the '457 Patent, instead of properly focusing on the ***subject matter of the claim*** as a whole.  These facts alone make the court's ruling specious.

## A.    The Court Erroneously Found the Patent Invalid as Obvious

Further, in finding that the '457 Patent is invalid as obvious, the district court determined that a prior art patent, U.S Patent 4,935,907 to Mark B. Friedman ("Friedman patent"), covered ***an element*** of claim 9 and, hence, rendered the '457 Patent obvious.  Not only was the court's conclusion faulty in being based on just an element of claim 9, but the technology at issue in the Friedman patent is ***wholly different than the technology*** called for in the '457 Patent and wholly defeats the intent and purpose of Appellants' hide and seek game invention.  The Friedman patent simply does not cover the invention of the '457 Patent.

The court further erroneously found the technology of the '457 Patent to be rudimentary when compared with prior art patent U.S Patent 6,344,797 to Hosny ("Hosny patent").  In reaching this conclusion, the court failed yet again to consider the subject matter of the '457 Patent as a whole, and failed to properly construe the Hosny patent.  A proper comparison of these two inventions shows that the technology of the '457 Patent is, in fact, ***more sophisticated*** than the

Hosny patent.

In sum, the district court's findings as to the validity of the '457 Patent are legally and factually unsound. The court committed clear error in granting Jakks' Motion for Summary Judgment as to this issue.

### B.  The Court Erroneously Found that Jakks' Care Bear Doll Did Not Infringe on the '457 Patent

Likewise, the district court wrongly ruled that Jakks' Care Bear Doll did not infringe, literally or under the Doctrine of Equivalents, on the '457 Patent. Once again, the district court improperly focused on just one element of Claim 9 of the '457 Patent, and then *misconstrued and improperly added limitations* to that element that do not actually exist.

In particular, the court concluded that Claim 9 requires its *user to be informed every time he or she moves of his or her distance from the doll*. Yet, Claim 9's plain language has no such requirement.

The district court further concluded that the Care Bear Doll makes a determination of the user's position *only when the user crosses a predetermined boundary*. In fact, the Care Bear Doll continuously assesses its user's distance from the doll.

While the Care Bear Doll may output the subsequent distance as the same as the prior distance, this does not mean that there has been no determination of a relative change in distance. This simply means that, as a consequence of the Care Bear Doll's predetermined distance settings, both the first and second distances fall in the same predetermined distance category, e.g., NEAR, such that the relative change is computed as none, causing messages unique to the predetermined distance category to continue to play. Further, as discussed above, Claim 9 does not require the user to be informed of his or her *incremental changes* in position relative to the doll.

In sum, the grounds upon which the district court based its finding of no infringement were wholly flawed.  The Care Bear Doll literally infringes on the '457 Patent.  At a minimum, the Care Bear Doll infringes under the Doctrine of Equivalents and/or these are triable issues of fact, such that the court's granting of Jakks' Motion for Summary Judgment was wholly improper.

**C.    The District Court Abused its Discretion in Denying Leave to Amend**

Finally, the district court abused its discretion in refusing to allow Appellants leave to amend their First Amended Complaint. The court wrongly found that such amendment would cause undue prejudice to Jakks and would be futile.

Appellants' proposed Second Amended Complaint concerned not only Claim 9 of the '457 Patent, but the other claims of the '457 Patent as well.  In finding undue prejudice to Jakks, the court contended that Appellants were seeking to effectively expand the scope of the action from one patent claim to fifteen claims.  However, there are only three independent claims in the '457 Patent, with the rest of the twelve claims being dependent thereon.  Moreover, Jakks defense, throughout this action, has specifically addressed ***all of the claims of the '457 Patent, not just Claim 9***.  Accordingly, any prejudice to Jakks would be minimal.

The district court further found that the amendment would be futile based on its analysis that Claim 9 of the '457 Patent is invalid and the Care Bear Doll does not infringe thereon.  Yet, as detailed herein, the court's conclusions were erroneous.  Hence, Appellants' amendment would not be futile.

In sum, the district court did not have good and sufficient grounds to deny Appellants' leave to file their proposed Second Amended Complaint.  In denying leave, the district court abused its discretion.

## VII.  <u>ARGUMENT</u>

The Judgment in this action arises from the district court's granting of Jakks' Motion for Summary Judgment, finding that the '457 Patent is invalid as obvious

and that the Care Bear Doll does not infringe thereon.  The granting of such a motion is only proper when there is no genuine dispute as to *any material fact* and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570 (Fed. Cir. 1994).

As detailed below, the '457 Patent is not invalid as obvious and Jakks' Care Bear Doll infringes on the '457 Patent.  At a minimum, triable issues of fact exist as to these issues.  The court's granting of Jakks' Motion for Summary Judgment was, therefore, wholly erroneous.

The Judgment in this action is also based on the district court's denial of Appellants' Motion for Leave to Amend the First Amended Complaint.  As detailed further below, the court abused its discretion in refusing to allow the amendment.

## A.    The '457 Patent is Not Invalid as Obvious

### 1.    The '457 Patent is Presumed to be Valid

A patent is presumed valid.  35 U.S.C. § 282.  In this case, the Patent Examiner for the '457 Patent had *nine prior art patents* and *four existing inventions* before him in connection with the issuance of the patent.  A794-A795, A800.  The Patent Examiner found the invention of the '457 Patent to be valid and to merit the issuance of the patent.

Notably, the district court began its analysis as to the validity of the '457 Patent with the faulty supposition that only *two* prior art patents were at issue in connection with its issuance.  A7.  In particular, the district court stated:

> Plaintiff state in their '457 patent that "[a] number of modern variations of the game of hide and seek have been developed and/or patented to incorporate modern electronic technology into devices to be used to play the game." (Doc. 15, Exh. 1, p. 5). However, Plaintiffs only referenced two prior art patents in their application for the '457 patent.  (A7, Ln. 18-21.)

Yet, the Information Disclosure Statement Appellants submitted to the

USPTO shows that Appellants, in addition to listing two prior art patents in their patent application, also identified ***five additional prior art patents***, along with ***four*** brochures and/or advertisements for then existing hide and seek like toys. A794-A795.   The Patent Examiner further found and cited ***two more prior art patents***. A800.  As the facts make clear, numerous prior art patent and inventions were before the Patent Examiner, who then found that the '457 Patent should be issued.

The presumption of 35 U.S.C. § 282 that a patent is valid is based upon the expertise of the Patent Office.  The court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S. Ct. 684 (1966) established the framework for assessing the validity of patent.  The *Graham* court confirms that "while we have focused attention on the appropriate standard to be applied by the courts, it must be remembered that the ***primary responsibility for sifting out unpatentable material lies in the Patent Office***."  *Graham v. John Deere Co.*, 383 U.S. at 18 (emphasis added).  As detailed below, the Patent's Examiner's determination that the '457 Patent was valid was wholly correct.

### 2.    The Invalidity of a Patent Must be Proven by Clear and Convincing Evidence

"[A]n invalidity defense [must] be proved by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).  In particular, 35 U.S.C. § 282 provides:

> ***A patent shall be presumed valid***.   Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims, dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.   ***The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity***.   *Id.* (emphasis added)

In this action, Jakks contended that the '457 Patent is invalid as obvious.

A231.  35 U.S.C. § 103 provides that a patent is invalid as obvious:

> ... if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains... *Id.* (emphasis added)

In *Graham v. John Deere Co. of Kansas City*, supra, 383 U.S. 1, 86 S. Ct. 684, the court set out a framework for applying the statutory language of § 103. Under § 103, a determination of "obviousness" rests upon the following factual findings: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, including commercial success, long felt but unsolved needs, and failure of others (collectively, the "*Graham* factors"). *Graham v. John Deere Co.*, 383 U.S. at 17.   The analysis begins with a key legal question, what is the invention claimed? *Thorner v. Sony Computer Entm't Am*. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

**3.    The *Graham* Analysis Results in the '457 Patent Not Being Invalid as Obvious**

**a.    The Invention of the '457 Patent Claim**

An appellate court reviews patent claim construction de novo. *Thorner v. Sony Computer Entm't Am*. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Courts are required to view the claimed invention ***as a whole***. 35 U.S.C. § 103; *Panduit Corp. v. Dennison Mfg. Co*., 810 F.2d 1561, 1567 (Fed. Cir. 1987).

The inquiry into patentability must be drawn toward the "subject matter as a whole" ***and not to the elements of a claimed combination and their individual novelty***. *Reeves Instrument Corp. v Beckman Instruments, Inc*. (1971) 444 F2d 26. It is error for a court to fail to consider the claimed subject matter as a whole and to, instead, consider a claimed element the "core" or "gist" of the method invention. *Loctite Corp. v Ultraseal, Ltd.* (1985) 781 F2d 861.

In this case, the district court, throughout its analysis, ***solely focused on one element of Claim 9 of the '457 Paten***t, referred to as the "calculating means" element. In particular, the district court construed this "calculating means" element as:

> [A] device determines a first distance between a receiver and a transmitter, a subsequent distance between the receiver and a transmitter, and whether the second distance is greater or less than said first distance.  A7, Ln. 5-7, 14-16.

Not only did the district court err in solely focusing on just one element of Claim 9, but the district court also ***misconstrued this element,*** as discussed in detail below.  The foundation of a court's analysis as to the validity of patent is its ***proper*** construction of the claim.  *Thorner v. Sony Computer Entm't Am*. LLC, 669 F.3d at 1365.

The district court's failure to properly construe the claim and its failure to focus on the subject matter of the claim as a whole are grounds alone for the reversal of its rulings.  Moreover, the district court's errors resulted in its ***entire analysis being wrong***.

### b.    The Differences Between the Claimed Art and the Prior Art Establish the Validity of the '457 Patent

Once a court has correctly construed the claim, the next step in the *Graham* analysis is for the court to review the scope and content of the prior art and the differences between the claimed invention and the prior art.  *Graham v. John Deere Co*., 383 U.S. at 17.  The district court, in this case, grounded its analysis on the faulty premise that only two prior art patents were at issue in connection with the issuance of the '457 Patent, and then deemed U.S Patent 4,935,907 to Mark B. Friedman ("Friedman patent") "***to cover the invention claimed in the "calculating means" element of Plaintiffs' Claim 9***."  A9, Ln. 5-6 (emphasis added).  In particular, the district court found that ***certain elements of Claim 1*** of the Friedman patent covered ***an element*** of Claim 9 of the '457 Patent and, therefore,

rendered the '457 Patent invalid as obvious. A9-A10. The district court's determination was wholly erroneous.

### i.    The Friedman Patent is Grounded on Wholly Different Technology

Jakks submitted the Friedman patent, along with multiple other prior art patents, in support of its Motion. A386-A387. The Friedman Patent was filed in 1988 and describes an electronic homing system. A549. The Friedman patent details the object of its invention as follows:

> [I]t is an object according to this invention to provide a system to help individuals with sensory deficiencies (e.g., blind or low vision) or mental confusion to find their way to desired objects or locations... to provide a system to remind an individual to get something (e.g., medicine) and to assist the individual in locating it... to provide a system for directing a mobile robot with local object avoidance capability to a desired objection or location. A554, Background of the Invention, ¶ 2.

The district court declared that "[o]n its face, the technology claimed in the 1988 Friedman patent appears to cover the invention claimed in ***the "calculating means" element*** of Plaintiff's Claim 9." A9, Ln. 5-6 (emphasis added). In making this determination, the district court focused on Claim 1 of the Friedman patent, finding that such claim "discloses a calculating means through which a mobile receiver device determines an initial distance between the receiver unit and the transmitter unit, one or more subsequent distances between the receiver unit and the transmitter unit, and a relative change in that distance." A9, Ln. 14-17.

In particular, the district court detailed Claim 1 of the Freidman patent as follows:

> The prior art in Claim 1 of the Friedman patent, ***in relevant part***, describes the function of a device that "generat[es] an internal representation of the distance between the receiving means and the selected module[,] ... compar[es] subsequent representations of the distances, [and] indicate[es] to the user whether the

distance is increasing or decreasing continuously as the mobile module is moved[.] A9, Ln. 9-13 (emphasis added).

In reviewing, *in its entirety,* Claim 1 of the Friedman patent, it is clear that the district court did not take Claim 1 as a whole, but instead pulled certain elements and phrases therefrom to support its erroneous determination that Claim 1 covers the '457 Patent's invention. A558.  As the court in *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 confirms, the inventions must be viewed in their entirety and not in a piecemeal fashion.  *In its entirety*, Claim 1 of the Friedman patent (the paragraph at issue) states:

[A] mobile module comprising means for repetitively at paced intervals transmitting coded omnidirectional EMR request signals, means for selecting a remote module by selecting the code for the omnidirectional request signals, *a plurality of distinct means* spaced apart and fixed to said mobile module for receiving *a sonic response signal from a selected one of the plurality of remote modules* initiated by each of said spaced request signals, means for generating an internal representations of the distance between the receiving means and the selected module *from the __time__ measured* between the transmission of the request signal and the receipt of the response signal, means for comparing subsequent representations of the distances, *means for generating an internal representation of the direction to the source of the response signal* based upon the *difference in the __time__ of arrival of the response signal* at said distinct means for receiving, output means indicating to the user whether the distance is increasing or decreasing *continuously* as the mobile module is moved and the direction to the source of the response signal, and an input means for selecting one of said remote modules based upon the unique request signal to which it responds.  A558.

In reviewing all of the elements in Claim 1, and not just certain elements or phrases therein, it is evident that Claim 1 of the Friedman patent does not disclose the elements of Claim 9 of the '457 Patent, including does not cover the calculating means element.

The homing device of the Friedman patent, as confirmed by Claim 1 and by the summary of its invention, measures **the time** it takes for **an ultrasonic signal** from a remote module to reach the mobile module. Ultrasound is an oscillating **sound pressure wave**, used to measure distances. **The invention specifically requires that at least one of the response and request signals be an ultrasonic signal "because the speed of sound is slow enough to enable the easy electronic measurement of times for the ultrasonic signals to travel between the mobile and remote modules**." A558; A554, Summary of Invention, Column 2, ¶ 2. Accordingly, the invention is wholly grounded on the use of an ultrasonic signal and measuring the time for that signal to reach a mobile module.

Quite differently, the '457 Patent measures **the strength** of **a radio signal** from a **transmitter unit**, and, thereby, the relative proximity of the seeker unit to the transmitter unit. The transmitter uses **radio waves**, which are a type of electromagnetic wave that travel **at the speed of light**. A1704.

The district court erroneously asserts that the plain language of Claim 9 of the '457 Patent shows that it is not concerned with the how or means of calculating a distance. A9. Yet, Claim 9's plain language shows that the invention specifically calls for the use of a **transmitter and receiver**, e.g., the use of radio waves. In particular, Claim 9 of the '457 Patent states that it's enhanced hide and seek game comprises "**a transmitter unit** associated with said object, said **transmitter unit** configured to transmit a signal generally outward from said object... **a receiver** therein for receiving said signal from said transmitter unit..." A1704.

Appellant's expert Harry Direen confirms the import of the use of this transmitter/receiver technology, stating that "[t]he invention of the '457 Patent, as identified in Claim No. 9, is taking advantage of known prior art, coupled with a low-cost transmitter, receiver and microcontroller, in order to create an enhanced hide and seek game." A1032, ¶ 23.

The district court erroneously omits these key elements of Claim 9 of the '457 Patent that definitively demonstrate that the inventions of Appellant's patent and the Friedman patent *are based on wholly different technology*.  Courts are required to view the claimed invention *as a whole.  The court commits error when it considers solely the individual novelty of an element of a claim and not the claimed subject matter of the invention as a whole*. 35 U.S.C. § 103; *Reeves Instrument Corp. v Beckman Instruments, Inc*. (1971) 444 F2d 26.)

### ii.    The Invention of the Friedman Patent Wholly Defeats the Purpose of the Invention of the '457 Patent

The district court further attempts to support its finding that the Friedman patent covers Appellant's invention by claiming that the Friedman patent's mobile module, like Appellant's seeker unit, indicates to the user whether the distance between the mobile module and the remote modules is increasing or decreasing as the user moves the mobile module. A9, Ln. 19-24.

However, Claim 1 of the Friedman patent states that the mobile module has an "output means indicating to the user whether the distance is increasing or decreasing *continuously*...and the *direction to the source* of the response signal..." A558.  Differently, Claim 9 of the '457 Patent states that the seeker unit contains "*a speaker for transmitting one or more messages to the game participant*... the game participant utilize said seeker unit to find the location of said object *by receiving said messages from said speaker*."  A1704.  Claim 9 makes clear that Appellants' seeker unit does not *continuously* alert the participant as to the distance *and direction* of the doll, unlike Claim 1 of the Friedman patent.

In fact, the Friedman technology wholly defeats the intent of Appellant's hide and seek game.  The Friedman invention permits its users to *quickly* locate numerous objects by continuously informing the user of the object's distance and the user's *orientation to the object*, *allowing the user to rapidly hone in and find the object*.  As the Friedman patent confirms, its invention's intent is to help the

blind, those with poor eyesight, and those with faulty memories quickly find various objects.

Appellants' invention is quite the opposite, in seeking to actively engage a child in a hide and seek game, and not to quickly lead the child to an object, which in fact is hidden from the child. As the '457 Patent explicitly states, its enhanced hide and seek game "encourages the child to utilize his or her deductive reasoning skills." A1701, ¶ 1.

In comparing the entirety of Claim 1 of the Friedman patent to the entirety of Claim 9 of the '457 Patent, it is clear that Friedman patent does not cover Appellant's invention.  The district court erred in finding otherwise.

### c.     The Other *Graham* Factors Support the Validity of the '457 Patent

The court's final steps in evaluating whether a patent is invalid as obvious is examining the level of ordinary skill in the art and any relevant secondary considerations, including commercial success, long felt but unsolved needs, and failure of others.  *Graham*, 383 U.S. at 17.  In reviewing these final *Graham* factors, the district court erroneously found the technology of the '457 Patent to be rudimentary compared to a particular prior art patent and that the '457 Patent meets no long felt, unsolved needs. A11.

### i.     The Court's Assessment as to the Level of Ordinary Skill in the Art was Erroneous

The district court did not make findings as to the level of ordinary skill in the art.  Instead, ***the court simply deemed Appellants' technology to be rudimentary***. A11.  As detailed below, the court made this erroneous conclusion by failing to understand the technology of the prior art patent it cited and by failing to view Appellants' invention as a whole, as it was required to do.

### a.     The Hosny Patent's Technology is Less Sophisticated

The court cited to U.S Patent 6,344,797 to Hosny ("Hosny patent"), submitted by Jakks (A386, Hosny Patent), to support its conclusion that Appellants' technology was rudimentary. The court found the digital electronic locater invention of the Hosny patent to be more sophisticated than Appellant's invention. A11.

In particular, the court detailed Hosny's digital electronic locater as follow:

> [T]he digital electronic locater described in the Hosny patent uses transmitter-receiver technology not only to alert the searcher as he or she gets closer to the object being located, but also to "provide information to the searcher regarding the direction of an object/animal/person" being located as well as to "provide information to the person being searched regarding the direction of the searcher" where the object being located is a person. A11, Ln. 4-8.

The district court's overly generalized statements entirely ignore the fact that the technology called for in the Hosny invention and in the '457 Patent are distinctly different. In fact, the technology of the '457 Patent is more sophisticated.

While both inventions use a transmitter and receiver, the '457 Patent specifically calls for a microprocessor in the seeker unit. A526, A1701. In particular, the seeker unit has a microprocessor that determines a first distance from the transmitter unit in the doll, a subsequent distance, and a relative change in distance, and a speaker to provide the participant with messages to assist him or her in locating the object. A1701.

To the contrary, the Hosny patent states that its "design is simple and it ***does not require a central processing unit*** (CPU) with its associated sophisticated control algorithms." A526, Column 2, ¶ 5 (emphasis added). In other words, ***Hosny's invention has no microprocessor and cannot perform the functions called for in the '457 Patent.*** A526. As such, the court's finding that the technology of the '457 Patent was rudimentary compared to the technology of the

*Hosny* patent was wholly erroneous.

### b.     The '457 Patent's Use of Known Technology Does not Render the Invention Rudimentary

The court further supported is finding that Appellant's technology was rudimentary by quoting Appellant's expert's statement that the '457 Patent involves only "known methods of determining distances using a transmitter, a receiver, and a computing device." A11, Ln. 9-10.  However, as detailed by Appellants' expert, Appellants' invention does not hinge on the novelty of transmitter, receiver and microprocessor technology:

> The use of a transmitter and receiver coupled with a computing device such as a microcontroller was known prior to the '457 Patent. The invention of the '457 Patent is not to teach how to use a FR (Radio Frequency) transmitter and receiver coupled with a computing device to calculate or measure distance... The invention of the '457 Patent, as identified in Claim No. 9, is taking advantage of prior art, coupled with a low-cost transmitter, receiver and microcontroller, in order to create an enhanced Hide N Seek Game.  The above is what the United States Patent Office deemed worthy of granting patent to Plaintiffs.  A1031-A1032, ¶¶ 20-24.

Appellants' incorporation of the transmitter, receiver and microprocessor technology into a hide and seek game is what the Patent Examiner deemed to validly support the patent. As the court in *Reeves Instrument Corp. v Beckman Instruments, Inc*. (1971) 444 F.2d 26 confirms, the inquiry into patentability must be drawn toward the "subject matter as a whole" and not to individual novelty of the elements.  The district court wholly erred in focusing on the individual novelty of an element of Claim 9 of the '457 Patent, instead of the invention as a whole.

### ii.     The Court's Assessment of the Secondary Considerations was Erroneous

The last *Graham* factor the court examined was the "long felt but unsolved needs."  Although the court deemed this factor to be insignificant to its obviousness analysis, the court opined that Appellants' patent did not resolve any

outstanding needs.  A11, Ln. 14-21.

In particular, Appellants' invention solves the problem of adults having to play hide and seek with children.  As Appellants' patent states "[w]hat is needed, therefore, is a hide and seek game and interactive apparatus for use with the game that can be played by one or more young children and which provides a level of interaction with the child or children that encourages the child to utilize his or her deductive reasoning skills."  A1701, Column 1, ¶ 1.

The court opined that prior inventions' technology and, in particular, the Friedman patent's technology, enables a single player to seek hidden objects. A11. Yet, as detailed above, the Friedman invention is ***based on wholly different technology*** and, moreover, the Friedman's mobile modules consistently alert its user as to his or her proximately and orientation to the various objects, ***allowing its user to quickly hone in on and locate the objects***.  The Friedman patent's invention did not resolve the need for an interactive hide and seek game that provided a child with the ability to utilize his or her deductive reasoning skills to locate a hidden doll.  Once again, the court failed to view the subject matter of Appellants' patent as a whole.

In fact, the district court confirms its focus on solely the "calculating means" element of Claim 9 throughout its analysis of the *Graham* factors, stating:

> Because an analysis of the *Graham* factors shows by clear and convincing evidence that the Plaintiffs' patent as to Claim 9's ***"calculating means" element*** is obvious, the '457 patent as to that element is invalid. A11, Ln. 22-25.

As the court in *Loctite Corp. v Ultraseal, Ltd.* (1985) 781 F2d 861 confirms, it is error for a district court to fail to consider the claimed subject matter ***as a whole*** and to, instead, consider a claimed element the "core" or "gist" of the method invention.

The facts and law, therefore, make clear, the district court's ruling that the

'457 Patent is invalid as obvious is clearly erroneous.  At a minimum, triable issues of fact exist, such that the district court's granting of Jakks' Motion for Summary Judgment as to this issue was in error.

## B.    Jakks' Care Bear Doll Directly Infringes on the '457 Patent

The district court determined that Jakks Care Bear Doll does not infringe on the '457 Patent because the '457 Patent is invalid as obvious.  A12, Ln. 1-4.  As discussed above, the court's conclusion as to the validity of the patent was erroneous.

The district court further found that, even if the '457 Patent is valid, Jakks' Care Bear Doll does not literally infringe on Claim 9 of the '457 Patent and does not infringe under the Doctrine of Equivalents.  A12-A13.  As detailed below, the district court's conclusions were wrong.

### 1.    The Care Bear Doll Literally Infringes on the '457 Patent

"[L]iteral infringement requires a showing that every limitation of at least one claim 'reads on' or covers the accused device[.]" *Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141, 1154-55 (W.D. Wash. 2008) (citing *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).  The infringement analysis entails two steps.  First, the meaning and scope of the asserted patent claims are determined. *Ranbaxy Pharms., Inc. v. Apotex, Inc.* 350 F.3d 1235 (Fed. Cir. 2003); *Cybor Corp. v. FAS Techs., Inc.* 138 F.3d 1448 (Fed. Cir. 1998) (en banc).  Second, the properly construed claims are compared to the accused product. *Ranbaxy Pharms., Inc. v. Apotex, Inc.* 350 F.3d 1235 (Fed. Cir. 2003); *Cybor Corp. v. FAS Techs., Inc.* 138 F.3d 1448 (Fed. Cir. 1998) (en banc).

In this case, there is no dispute that the Care Bear Doll literally infringes on all elements of Claim 9 of the '457 Patent, excepting the disputed "calculating means" element.  A12-A13.  In particular, Claim 9 of the '457 Patent provides:

An enhanced hide and seek game comprising:
     a.   an object capable of being hidden;
     b.   a transmitter unit associated with said object, said transmitter unit configured to transmit a signal generally outward from said object; and
     c.   a seeker unit associated with the game participant, said seeker unit having a receiver therein for receiving said signal from said transmitter unit; said seeker unit comprising a calculating means for determining a first distance between said seeker unit and said object, a second distance between said seeker unit and said object and a relative change in distance, said seeker unit further comprising a speaker for transmitting one or more messages to the game participant;
     d.   wherein after said object is hidden and said transmitter unit is activated, the game participant utilize said seeker unit to find the location of said object by receiving said messages from said speaker. A1704.

The Care Bear Doll is an object capable of being hidden. The Care Bear Doll has a transmitter inside, which transmits a signal outward from the Care Bear Doll. The Care Bear Doll game participant uses a seeker unit, with a receiver, to find the location of the Care Bear Doll via messages from a speaker in the seeker unit. In fact, many of the messages from the Care Bear Doll are identical or essentially identical to Appellant's Haley Doll derived from the '457 Patent, e.g., "you're cold," "you are getting warmer," "hurray you found me." A93-A97; A106-A126, A128; A260-A265; A284-A309.

The district court determined that the question is, therefore, whether the Care Bear Doll literally infringes on the "calculating means" element of Claim 9. A12-A13. The district court wrongly concluded that the doll does not infringe.

## a.    The District Court Misconstrued Claim 9

In particular and as detailed above, the district court construed the "calculating means" element of Claim 9 as follows:

A function limitation whereby a device determines a first distance between a receiver and a transmitter, a subsequent distance between the receiver and transmitter,

and whether the second distance is greater or less than said first distance.  A12, Ln. 28; A13, Ln. 1-2.

Contrary to the court's interpretation, Claim 9, in relevant part, provides for a seeker unit to have a means for "determining a first distance... a second distance... a relative change in distance... a speaker for transmitting one or more messages to the game participant...." and that the user "utilize said seeker unit to find the location of said object by receiving said messages from said speaker." A1704.  The '457 Patent goes on to explain that the invention ***does not require the calculation of actual distance:***

> ***It is not necessary that seeker unit 14 of the present invention 10 be able to calculate the actual distance*** (i.e., in feet and/or inches) between object 12 and participant 16. Instead, it is only necessary that seeker unit 14 be able ***to measure the relative strength of signal 34, with the weaker signals*** 34 indicating seeker unit 14 (and therefore participant 16) is further away from object 12 and stronger signals 34 indicated participant 16 is closer to object 12. A1702, ¶5 (emphasis added).

The Care Bear Doll directly infringes on the '457 Patent in functioning exactly as called for therein.  In particular, the seeker unit in the Care Bear Doll utilizes two different digital output signals (FW and BW signals) to assess the distance of the seeker unit from the transmitter based on the strength of the signals from the transmitter unit.  Based on the strength of these signals, the FW and/or the BW signals in the seeker unit are activated or not activated.  Based on whether the FW and BW signals are activated, the seeker unit determines whether the participant is FAR, NEAR or within CLOSE PROXIMITY from the Care Bear Doll.  A93-A97; A106-A120; A260-A265; A284-A309.

When the seeker unit in the Care Bear Doll is approximately 20 feet or more from the transmitter unit, the CPU in the seeker unit determines the doll is FAR. When the seeker unit is within approximately 3 to 20 feet from the transmitter unit, the CPU determines it is NEAR. When the seeker unit is within about 3 feet from the transmitter unit, the CPU determines it is in CLOSE PROXIMITY.  The Care

Bear Doll then alerts its participant of his or her relative distance from the doll via playing messages unique to each of these three proximities. A93-A97; A106-A120; A260-A265; A284-A309.

The district court concluded that, despite these characteristics, the Care Bear Doll does not infringe on the '457 Patent because Claim 9 requires its user to be informed *every time he or she moves* of his or her distance from the doll, which the Care Bear Doll does not do.  A13, Ln. 21-23.  Further, the district court concluded that, unlike the '457 Patent, the Care Bear Doll makes a determination of the user's position *only when the user crosses a predetermined boundary*. A13, Ln. 4-8.  The district court's findings were wholly erroneous, including in adding limitations to Claim 9 that do no exist.

### b.    The '457 Patent Does Not Require the User Be Alerted As to His or Her Distance From the Doll Every Time the User Moves

The district court found the Care Bear Doll's use of predetermined distances to be fatal to Appellant's infringement claim.  In particular, the court asserted that the Care Bear Doll allows the user to locate the doll by alerting the user *only when the user crosses a boundary of predetermined distance from the object*.  Whereas, the '457 Patent "allows the user to locate the [doll] by informing the user whether the user has moved closer to or farther away from the [doll] *whenever the user moves*." A13, Ln. 19-23.

The district court erroneously added limitations to Claim 9 of Appellant's patent that do not exist. Claim 9 *does not* call for informing the user, *whenever the user moves,* of his or her distance from the doll.  The actual language of Claim 9 provides for the seeker unit having a means for "determining a first distance... a second distance... a relative change in distance... a speaker for transmitting one or more messages to the game participant...." and that the user "utilize said seeker unit to find the location of said object by receiving said messages from said speaker."  A1704.  There simply is no limiting language in Claim 9 that calls for

the user to receive messages altering the user as to his or her **specific** proximity from the doll **every time the user moves**.

In fact, just like the Care Bear Doll, Appellants' Hayley Doll, embodying the invention of the '457 Patent, determines whether the participant is within one of **three predetermined distances** from the doll. The Hayley Doll then alerts its user of his or her relative proximity from the doll via playing a series of messages unique to each of these three proximities. The Hayley Doll does not have messages unique to each specific distance the user happens to be relative to the doll, nor does the '457 Patent require the same. A127-A128. The court clearly added limitations to the elements of Claim 9 that simply do not exist.

### c.    The Care Bear Doll Continuously Determines the User's Relative Distance from the Doll

The district court further attempts to differentiate the Care Bear Doll from Claim 9 by contending:

> Unlike the function described in Claim 9, Defendant's toy cannot and does not determine whether a subsequent distance between the transmitter and the receiver is greater or less than an initial distance between the transmitter and the receiver **unless the receiver moves across one of two boundaries of the predetermined distances**. A13, Ln. 5-8 (emphasis added).

Notably, **the district court admits that the Care Bear Doll can and does determine a relative change in distance when the seeker unit moves across predefined boundaries.** At a minimum, this raises a triable issue of fact such that the court's granting of Jakks' Motion for Summary Judgment was improper.

Furthermore, the district court's contention that the Care Bear Doll only makes a determination of the user's position when the user crosses a predetermined boundary is incorrect. In particular, the Care Bear Doll's seeker unit uses it FW and BW output signals to continuously monitor the strength of the signals from the doll, and then informs its user of his or her relative proximity to the doll via verbal

messages played *every three seconds*.  Additionally, whenever the user presses the "play" button on the seeker unit during the game, he or she is informed of his or her relative proximity to the Care Bear Doll.  A93-A97; A106-A120; A260-A265; A284-A309.

While the seeker unit in the Care Bear Doll may at times output this relative distance as the same as the prior distance, ***this does not mean that there has been no determination of a first distance and a second distance and a relative change in distance***.  This simply means that, as a consequence of the predetermined distance settings, both the first and second distances fall in the same predetermined distance category, e.g., NEAR, such that the relative change is computed as none, causing the same messages to be played through the seeker unit's speaker.

As such, the district court's assertion that the Care Bear Doll only makes a determination of the user's position when the user crosses a predetermined boundary is erroneous.  Moreover, as discussed above, Claim 9 does not require the seeker unit to alert the game participant of his or her ***incremental changes*** in position.  Again, Claim 9's language solely requires the seeker unit have a means for "determining a first distance... a second distance... a relative change in distance... a speaker for transmitting one or more messages to the game participant...." and that the user "utilize said seeker unit to find the location of said object by receiving said messages from said speaker."  A1704.  The Care Bear Doll does just that.

### d.    Whether the Care Bear Doll Infringes on Another Patent is Wholly Irrelevant

Finally, the district court suggests that the Care Bear Doll infringes on U.S. Patent No. 6,311,982 to Lebensfeld ("Lebensfeld patent") and, hence, cannot infringe on the '457 Patent.  A13.  In particular, the Patent Examiner for the '457 Patent specifically cited and examined the Lebensfeld patent in connection with the issuance of the '457 Patent.  A800.  The Patent Examiner found Appellants'

invention patentable despite the Lebensfeld patent. The district court confirmed the same in not finding the '457 Patent invalid as obvious based on the Lebensfeld patent. The fact that Jakks' Care Bear Doll may or may not also infringe on the Lebensfeld patent ***does not negate the doll's infringement on the '457 Patent***.

The Care Bear Doll, in having a seeker unit that determines a first distance, a subsequent distance, a relative change in distance, and a speaker for transmitting messages so that its game participant can locate the doll, literally infringes on Claim 9 of the '457 Patent. At a minimum, a triable issue of fact exists, such that the court's granting of Jakks' Motion for Summary Judgment as to this issue was erroneous.

### 2.    The Care Bear Doll Infringes on the '457 Patent Under the Doctrine of Equivalents

Even if we were to assume, in arguendo, that the Care Bear Doll did not literally infringe on the '457 Patent, the Care Bear Doll still infringes on the '457 Patent under the Doctrine of Equivalents. When an accused device does not literally infringe, a patentee may prove infringement under the Doctrine of Equivalents. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352 (Fed. Cir. 2000).

Infringement under the Doctrine of Equivalents requires "that the fact finder determine whether differences between particular elements of the accused device and the asserted claims are insubstantial." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1467 (Fed. Cir. 1998) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 117 S.Ct. 1040, 1054, (1997)); see also, *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1222 (Fed. Cir. 1996) ("Under § 112, the concern is whether the accused device, which performs the claimed function, has the same or an equivalent structure as the structure described in the specification corresponding to the claim's means. Under the doctrine of equivalents, on the other hand, the question is whether the accused device is only insubstantially different

than the claimed device.") (internal citations omitted). "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609 (1950).

In this case, the Care Bear Doll is wholly based on the invention of '457 Patent, and Appellants' Hayley Doll embodying the patent's invention. In 2003, Appellants contacted Play Along Toys, Jakks' subsidiary, via telephone to market the Hayley Doll concept based on its '457 Patent. Appellants submitted website information containing demonstrations of the Hayley Doll concept to Play Along Toys. No deal ever transpired. Then, approximately two years later, Jakks, through its subsidiary company, Play Along Toys, began marketing and selling the Care Bear Doll. A24; A201-A204; A279.

Like the invention of the '457 Patent and Appellants' Hayley Doll, the Care Bear Doll is an enhanced hide and seek game. Both the Care Bear Doll and the Hayley doll called for under the '457 Patent are designed to be hidden. Both dolls contain a transmitter inside, which transmits a signal outward from the dolls. The game participants of both dolls use a seeker unit to find the location of the dolls. The receivers in both seeker units monitor the strength of the signals from the transmitters in the dolls and determine, based on the strength of those signals, the relative proximity of the participants from the dolls. A93-A97; A106-A126, A128; A260-A265; A284-A309.

Both seeker units clue their participants in as to their proximity to the dolls by emitting essentially the same audio messages to the participants from speakers on the seeker units. In fact, many of the messages from the Care Bear Doll are identical or essentially identical to the Haley Doll, e.g., "you are getting warmer," "hurray you found me." Both of these dolls also have light signals on the seeker units to alter the participants as to their relative proximity to the dolls. A93-A97; A106-A126, A128; A260-A265; A284-A309.

As discussed above, there is no dispute that the Care Bear Doll infringes on every element of Claim 9, excepting the disputed "calculating means element." Yet, any slight differences found between this element and the Care Bear Doll's means for measuring the distances from the seeker unit to the dolls are wholly insubstantial and effectively yield the same result.  In fact, both the Care Bear Doll and the Hayley Doll rely on three predetermined distance ranges to trigger audible messages and light signals particular to each of the three ranges. A93-A97; A106-A126, A128; A260-A265; A284-A309.  To an uneducated person, the Care Bear Doll performs in just the same way as the Hayley Doll, which embodies the invention of the '457 Patent.

In sum, the Care Bear Doll has the same or an equivalent function and structure as called for in Claim 9.  Therefore, under the Doctrine of Equivalents, the Care Bear Doll infringes on the '457 Patent.  The district court erred in ruling otherwise.  At a minimum, triable issues of fact exists such that Jakks' Motion for Summary Judgment as to this issue should not have been granted.

**C.**    **The District Court Wrongly Denied Appellants' Motion for Leave to Amend Their First Amended Complaint**

Finally, the District Court denied Appellants' Motion for Leave to Amend their First Amended Complaint. A1.  In particular, on January 3, 2012, Appellants filed their Complaint for Patent Infringement against Jakks.  On or about March 30, 2012, Appellants filed their First Amended Complaint. A21.  On October 2013, Appellants filed their Motion seeking leave to amend their First Amended Complaint, including confirming that all claims of the '457 Patent served as a basis for Jakks' infringement of the '457 Patent. A1643.

Federal Rules of Civil Procedure, Rule 15(a) states the "court shall freely give leave when justice so requires." Although the decision of whether to grant leave to amend is committed to the sound discretion of the court, the term "discretion" may be a misleading term, for rule 15(a) severely restricts the judge's

freedom, directing that leave to amend 'shall be freely given when justice so requires." (*Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc*. 713 F.2d 618 (1th Cir. 1993); *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1991).)

"[U]nless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." (*Shipner v. Eastern Airlines, Inc. 868 F.2d 401* (11th Cir. 1999).) "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" (*Forman v. Davis*, 371, U.A. 178, 182 (1962).)

In this case, the court refused to grant Appellants leave, finding that the proposed Second Amended Complaint would result in prejudice to Jakks in "substantially expanding the issues in this litigation and requiring Defendant to undertake a new course to defense..." A15, Ln. 24-28.

The court further opined that the amendment would be futile "because Plaintiff cannot overcome the obviousness of Claim 1 or Defendants' non-infringement of Claim 1." A16, Ln. 14-16. Finally, the court found undue delay and amending contrary to judicial economy. A17-A18. In making such findings and denying Appellants leave to amend, the district court abused its discretion.

1. <u>Any Prejudice to Jakks Failed to Justify the Denial of the Motion</u>

a. <u>The Patent Claims Appellants Seek to Add are Already At Issue</u>

Appellants' proposed Second Amended Complaint concerned not only Claim 9 of the '457 Patent, but the other claims of the '457 Patent as well. A1651. The court contended that Appellants were seeking to effectively expand the scope of the action from one patent claim to fifteen claims. A14.

However, there are only three independent claims in the '457 Patent, with the rest of the twelve claims being dependent on these three claims. A1704. For instance, Claims 2 through 6 all are dependent on Claim 1. Claims 10 through 15 are all dependent on Claim 9. A1704. Accordingly, Appellants are not seeking to add fifteen wholly new claims to this action.

Moreover, Jakks' defense, throughout this entire action, has specifically addressed **all of the claims of the '457 Patent**, including and in particular the three independent claims, i.e., Claim 1, Claim 7 and Claim 9. For instance, Jakks' Motion for Summary Judgment sought Summary Judgment **as to Claim 1, Claim 7 and Claim9,** including specifically detailing each of these three independent claims in its moving papers. A220-A223.

Jakks' expert, Garry Kitchen, extensively reviewed Claim 1, Claim 7 and Claim 9. A257-A260. In fact, Mr. Kitchen's analysis and opinion addresses all of the claims of the '457 Patent, with Mr. Kitchen specifically confirming the same in his Export Report, stating **"I have prepared this report to provide my opinions concerning whether the [Care Bear Doll] infringe any of claims 1-15 of U.S. Patent 6,494,457."** A257-A260, A279, ¶ 19. Likewise, Jakks' expert, Richard Klar, who reviewed the prior art patents, based his analysis and opinion on **all three independent claims of the '457 Patent**. A252-A255.

Accordingly, Jakks will not suffer prejudice in adding the additional claims of the '457 Patent. These claims have already essentially been at issue throughout this action, with Jakks acting accordingly.

Furthermore, Jakks' action in litigating all of the claims in its Motion for Summary Judgment is tantamount to an implied consent to Appellants amending their First Amended Complaint to cover all of these claim. For instance, in *Mooney v City of New York* (2000, CA2 NY) 219 F3d 123, the defendant did not plead waiver as an affirmative defense in its answer, but raised the defense for first time in its motion for summary judgment. The plaintiff responded on the merits of

defendant's waiver defense, without objecting to its assertion at that time.  The *Mooney* court found that plaintiff's conduct could be interpreted as implied consent for defendant to file an amended answer.  *Id.*  cert den (2001) 531 US 1145.

Likewise, Jakks' actions should be taken as an implied consent to the filing of the amended complaint.   Federal Rules of Civil Procedure, Rule 15(a) specifically allows for an amendment based on the consent of the adverse party.

### b.    The Addition of the New Claims Appellants Seek to Add Will Not Cause Grave Injustice to Jakks

The court also noted, in its denial of leave to amend, that Appellants were seeking to add new claims for inducement of infringement and contributory infringement.  A15.  However, these claims are indisputably, substantially related to the direct infringement claims already at issue. Courts have found that no undue prejudice exists where the proposed amendments are "substantially related" to the claims contained in the existing pleading.  (*Hip Hop Beverage Beverage Corp. v. RIC Represencoes Importacao E comercio Ltda* 220 F.R.D. at 622.)

Furthermore, Appellants offered to stipulate to the reopening of discovery, to continue the trial, to Jakks' subsequent filing of a summary judgment motion based on these new claims.  A1648-1649, ¶ 21.  Accordingly, any prejudice to Jakks would be substantially mitigated thereby.

The test in determining whether allowance of amendment to pleadings by adding a separate count is valid under Rule 15 is not whether any practical prejudice results from such amendment, but is whether allowing of amendment produces ***grave*** injustice to opposing party in terms of preparing his defense. (*Patton v Guyer* 443 F2d 79 (1971, CA10 Kan).)  Given the foregoing facts, Jakks would suffer no grave injustice from the amendment.

Even if, in arguendo, the adding of the inducement of infringement and contributory infringement claims were found to produce grave injustice, at a minimum, the court should have permitted the amendment to the extent of

allowing Appellants to add all of the claims of the '457 Patent.

## 2.    The Amendment Would Not Be Futile

### a.    The '457 Patent is Not Invalid as Obvious

The court held that amending the operative complaint would be futile because Appellants cannot overcome the obviousness of the '457 Patent, rendering it invalid.  A16.  In particular, the court focused on Claim 1 of the '457 Patent in so ruling.  The court construed Claim 1 to disclose:

> [a] method for playing an enhanced hide and seek game... comprising the steps of ... determining a first distance between said seeker unit and said transmitter unit; determining a second distance between said seeker unit and said transmitter unit; comparing said second distance to said first distance to determine a change in distance and whether said second distance is great or less than said first distance; [and] communicating a game message from said seeker unit to the game participant regarding said change in distance[.]  A16, Ln. 18-23.

Once again, the court found that the Friedman patent renders Claim 1 obvious.  A16.  However, as discussed above, the Friedman patent is grounded on wholly different technology, and not on the transmitter-receiver technology specifically called for in the '457 Patent, including Claim 1.  The Friedman patent further is aimed at allowing its users (e.g., the blind) to quickly hone in on and find various objects by continuously informing its users of their distance and orientation to the various objects.  Unlike the invention of the Friedman patent, Claim 1 provides children with a game that encourages them to use their deductive reasoning skills to find the purposely hidden doll.  A1701, Column 1, ¶ 1; A1704.

The court further contended that, like Claim 9, the Hosny patent renders Claim 1 obvious as it makes the technology of the '457 Patent rudimentary. A17. Yet, as discussed above, the technology of the '457 Patent in utilizing a microprocessor is, in fact, more sophisticated then the technology used by the Hosny patent.

The court additionally relied on the rest of its obvious analysis pertaining to Claim 9 for its conclusion that Claim 1 is also obvious. A16-A17. However, as discussed above, the court's findings as to the obviousness of Claim 9 and, thus, as to Claim 1, are erroneous.

### b.   The Care Bear Doll Infringes on the '457 Patent

The court further found that amending the complaint would be futile because the Care Bear Doll does not literally infringe on Claim 1, or infringe under the Doctrine of Equivalents. In reaching this conclusion, the court relied upon its same analysis for Claim 9. A17. As discussed in detail above, the Care Bear Doll, in having a seeker unit that determines a first distance, a subsequent distance, a relative change in distance, a speaker for transmitting messages to the game participant for fining the hidden object literally infringes on the '457 Patent, including Claim 1.

Even if we were to assume, in arguendo, that the Care Bear Doll did not literally infringe on the '457 Patent, the Care Bear Doll still infringes on the '457 Patent based on the Doctrine of Equivalents as any slight differences found between the '457 Patent's and the Care Bear Doll's means for measuring the distances from the seeker unit to the dolls are wholly insubstantial and effectively yield the same result.

Accordingly, the court's determination that permitting the amendment would be futile is wholly incorrect. "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (citing *Baker v. Pacific Far East Lines, Inc.*, 451 F.Supp. 84, 89 (N.D. Cal. 1978). The facts show that Appellants have a viable claim for Jakks' infringement on all of the claims of the '457 Patent.

### 3.   Appellants' Delay Should Not Prevent the Amendment

The court also found that Appellant's unduly delayed in seeking to file the

amended complaint.  A17.  However, the delay in this instance was a consequence of Appellants' counsel's inadvertent mistake in not sooner seeking leave.

In connection with Jakks' April 2012 Motion to Dismiss Appellants' First Amended Complaint, Appellants had requested leave to file a Second Amended Complaint. The issue was overlooked and not resolved.  However, when the district court questioned whether Appellants' First Amended Complaint alleged infringement of all the claims in the '457 Patent, as opposed to just Claim 9, and Appellants realized the discrepancy and filed their motion for leave to amend. A1647-A1648.

As the district court itself confirmed, delay alone, while relevant, is not enough to support denial.  A18, Ln 1-3; *Morongo Band of Mission Indians v. Rose*, 893 F.2d at 1079 (citing *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1319-20 (9th Cir. 1984). Additionally, "the timing of a motion for leave to amend the complaint after a motion for summary judgment does not necessarily preclude the amendment.  Federal Rule of Civil Procedure 15 permits amendments to add new claims even when a motion for summary judgment is pending." *Phoenix Solutions, Inc.*, 637 F.Supp.2d 683, 692 (N.D. Cal. 2009).

Accordingly, the delay in this instance should not be a barrier to permitting Appellants to file their amended complaint, especially given that lack of grave prejudice to Jakks and that the amendment would not be futile.

### 4.    The Additional Factors Considered by the Court Do Not Justify Denying the Motion

Finally, the court considered judicial economy and the most expeditious way to dispose of the merits of the litigation.  In considering these two factors, the court found them to be "especially pertinent here" given the court's heavy caseload. A18.

While Appellants are aware and sympathetic to the court's caseload, the same cannot serve as a basis to deny Appellants their day in court.  Appellants

have asserted viable claims against Jakks in their proposed Second Amended Complaint.  The court's denial of Appellants' motion for leave to file this Second Amended Complaint was an abuse of discretion.

## VIII.  <u>CONCLUSION</u>

Appellants have shown that Claim 9 of the '457 Patent in not invalid as obvious.  Appellants have shown that Jakks' Care Bear Doll infringes, literally and under the Doctrine of Equivalents, on Claim 9 of the '457 Patent.  At a minimum, Appellants have shown that triable issues of fact exist as these issues, such that the district court's granting of Jakks' Motion for Summary Judgment was erroneous.

Further, Appellants have shown that the district court abused its discretion in not granting Appellants leave to amend their First Amended Complaint.

For the foregoing reasons, Appellants respectfully requests that this Court reverse the Judgment of the district court, and reverse the district court's granting of Jakks' Motion for Summary Judgment and denial of Appellants' Motion for Leave to Amend the First Amended Complaint.

Respectfully Submitted,

DATED: February 7, 2014    By  /s/ Lenden F. Webb
                                Lenden F. Webb, Esq. (SBN 236377)
                                WEBB & BORDSON, APC
                                466 West Fallbrook Avenue, Suite 102
                                Fresno, California 93711
                                Telephone: (559) 431-4888
                                Facsimile: (559) 821-4500

                                Attorneys for Plaintiffs-Appellants

# Addendum 1

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHELLY CONTE, an individual; CINDY REICHMAN, an individual, | 1:12-CV-00006-LJO-GSA |
| Plaintiffs, | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT** |
| v. | (Docs. 69, 70, 87) |
| JAKKS PACIFIC, INC., a Delaware corporation, and DOES 1 TO 25, | |
| Defendants. | |

**PRELIMINARY STATEMENT TO PARTIES AND COUNSEL**

Judges in the Eastern District of California carry the heaviest caseload in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. This Court cannot address all arguments, evidence and matters raised by parties and addresses only the arguments, evidence and matters necessary to reach the decision in this order given the shortage of district judges and staff. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to consider consent to a Magistrate Judge to conduct all further proceedings in that the Magistrate Judges' availability is far more realistic and accommodating to parties than that of U.S. District Judge Lawrence J. O'Neill who must prioritize criminal and older civil cases.

**INTRODUCTION**

Plaintiffs Shelly Conte and Cindy Reichman (collectively "Plaintiffs") bring this action for patent infringement against Defendant Jakks Pacific, Inc. ("Defendant" or "Jakks"). Jakks filed

1

counterclaims against Plaintiffs for declaratory relief and for common law violations.  Plaintiffs and Jakks each have filed a motion for summary adjudication of the infringement claims.  Plaintiffs also move this Court for leave to amend Plaintiffs' first amended complaint.  Upon careful consideration of the parties' submissions and the entire record in this case, the Court DENIES Plaintiffs' motion for summary adjudication and GRANTS Jakks' motion for summary adjudication.  The Court also DENIES WITH PREJUDICE Plaintiffs' motion to amend the operative complaint.

**BACKGROUND**

**A.     Facts**

Plaintiffs are the exclusive licensees of all right, title, and interest in United States Patent No. 6,494,457 ("'457 patent") issued by the United States Patent and Trademark Office on December 17, 2002.  The '457 patent relates to (1) an object that is capable of being hidden, (2) a transmitter unit associated with the hidden object, and (3) a seeker unit containing a receiver with means for calculating the distance between the seeker unit and the transmitter unit and changes in that distance. The '457 patent contains fifteen claims.

Plaintiffs have incorporated the patent into a toy doll that they manufacture, "Hide-N-Seek Hayley," which allows a child to play an interactive game of hide-and-seek by relaying clues to the child based on his or her proximity to the doll.

In or around 2005, Jakks began marketing Care Bear dolls under license from the owner of the Care Bears trademark.  One of these Care Bear dolls marketed by Jakks is the "Hide 'N Seek Care Bear" doll.  Plaintiffs contend that the Hide 'N Seek Care Bear doll infringes Plaintiffs' '457 patent. The Hide 'N Seek Care Bear consisted of: (1) a plush toy doll capable of being hidden; (2) a transmitter device attached to the toy doll; and (3) a seeker unit capable of receiving various clues depending on its proximity to the toy doll.  Plaintiffs claim that Defendant's Care Bear doll directly infringes Plaintiffs' '457 patent.

**B.     Procedural History**

Plaintiffs filed their original complaint in this case on January 3, 2012.  They filed an amended complaint on April 3, 2012.  On June 19, 2012, this Court granted in part and denied in part Defendant's motion to dismiss Plaintiffs' amended complaint.  Defendant filed an answer and

2

1   counterclaims on August 13, 2012.  On December 10, 2012, this Court granted in part and denied in
2   part Plaintiffs' motion to dismiss Defendant's counterclaims.  Defendant filed amended counterclaims
3   on December 13, 2012, and Plaintiffs filed an answer on January 2, 2013.  On August 29, 2013, and
4   August 30, 2013 Plaintiffs and Defendant respectively filed the instant motions for summary
5   adjudication as to the direct infringement claims in Plaintiffs' amended complaint.[1]  Plaintiffs and
6   Defendant filed respective oppositions on September 26, 2013 and replies on October 3, 2013.  On
7   October 29, 2013, Plaintiffs filed a motion for leave to amend the first amended complaint.

**DISCUSSION**

**Motion for Summary Judgment**

A.    **Legal Standard**

Fed .R. Civ. P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim."  "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense."  *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2); *Matsushita Elec. Indus. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn*., 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec*., 475 U.S. at 586, n. 11; *International Union of Bricklayers v. Martin Jaska, Inc*., 752 F.2d 1401, 1405 (9th Cir. 1985).

The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita*, 475 U.S. at 587.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–

---

[1] This Court previously granted Defendant's motion to dismiss Plaintiffs' indirect infringement claim.  Defendant's counterclaims are not a part of this summary judgment proceeding.

252.

    To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000); *see, High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

    "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102–1103; *see, Adickes v. S. H. Kress & Co*., 398 U.S. 144, 160 (1970). "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see, High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

    "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see, Celotex*, 477 U.S. at 322. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp*., 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co*., 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "The mere existence of a scintilla of

4

1   evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

2   "In cases that involve ... multiple causes of action, summary judgment may be proper as to

3   some causes of action but not as to others, or as to some issues but not as to others, or as to some

4   parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also, Robi v.*

5   *Five Platters*, Inc., 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*,

6   878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it

7   will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal.

8   1977).

9   **B.    Analysis**

10   Each party moves this Court to grant summary adjudication in its favor as to Plaintiffs' direct

11   infringement claims. Plaintiffs argue that Defendant's Care Bear doll directly infringes on Claim 9 of

12   Plaintiffs' '457 patent. Specifically, Plaintiffs allege that the Care Bear doll infringes the "calculating

13   means" element of Claim 9. Defendant asserts that said element of Claim 9 of Plaintiffs' '457 patent is

14   invalid as obvious. Defendant further argues that Defendant's Care Bear doll does not directly infringe

15   on Claim 9.

16   **1.    Obviousness**

17   The Patent Act makes clear that "[a] patent shall be presumed valid" and that "[t]he burden

18   of establishing in-validity of a patent or any claim thereof shall rest on the party asserting such

19   invalidity." 35 U.S.C. § 282. "[A]n invalidity defense [must] be proved by clear and convincing

20   evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

21   Under 35 U.S.C. § 103, a patent is invalid as obvious "if the differences between the claimed

22   invention and the prior art are such that the claimed invention as a whole would have been obvious

23   before the effective filing date of the claimed invention to a person having ordinary skill in the art to

24   which the claimed invention pertains." A determination of "obviousness" rests upon the following

25   factual findings: (1) the scope and content of the prior art; (2) the differences between the claimed

26   invention and the prior art; (3) the level of ordinary skill in the art; and (4) any relevant secondary

27   considerations, including commercial success, long felt but unsolved needs, and failure of others

28   (collectively, the "*Graham* factors"). *Graham v. John Deere Co*., 383 U.S. 1, 17 (1966).

5

1    Though a court must base its obviousness determination on these factual findings, the

2    question of whether a patent is obvious is ultimately a question of law.  *KSR Int'l v. Teleflex Inc.*, 550

3    U.S. 398, 427 (2007); *Graham*, 383 U.S. at 17.

4    "The claims of a patent must 'particularly (point) out and distinctly (claim) the subject matter

5    which the applicant regards as his invention.'"  *Palmer v. Orthokinetics, Inc.*, 611 F.2d 316, 322 (9th

6    Cir. 1980) (quoting 35 U.S.C. § 112).  "'Courts can neither broaden nor narrow the claims to give the

7    patentee something different from what he has set forth.'"  *Id.* (quoting *Autogiro Co. v. United States*,

8    384 F.2d 391, 396 (1967)).

9                    **i.        "Calculating means" element**

10    As discussed above, the '457 patent relates to (1) an object that is capable of being hidden,

11    (2) a transmitter unit associated with the hidden object, and (3) a seeker unit containing a receiver and

12    a means for calculating the distance between the seeker unit and the transmitter unit and differences in

13    that distance.  Specifically, Claim 9 of the '457 patent discloses, in relevant part, "said seeker unit

14    comprising a calculating means for determining a first distance between the seeker unit and said object,

15    a second distance between said seeker unit and said object, and a relative change in distance[.]"  (Doc.

16    15, Exh. 1, p. 10).

17    Defendants interpret the "calculating means" element as a means-plus-function limitation.

18    Plaintiffs assert that Claim 9 "is not concerned with the how or the means of calculating a distance[.]"

19    (Doc. 69, p. 10).  Rather, "the claimed invention simply requires that the game determine at least a first

20    and a second distance and determine a relative chance in distance."  *Id.*

21    "[T]he words of a claim 'are generally given their ordinary and customary meaning.'"

22    *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic,*

23    *Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he ordinary and customary meaning of a claim term is

24    the meaning that the term would have to a person of ordinary skill in the art in question at the time of

25    the invention[.]"  *Id.*  "In some cases, the ordinary meaning of claim language as understood by a

26    person of skill in the art may be readily apparent even to lay judges, and claim construction in such

27    cases involves little more than the application of the widely accepted meaning of commonly

28    understood words."  *Id.* at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) for the

6

1  holding that the claims did "not require elaborate interpretation").

2        The language of Claim 9 does not involve terms of art and lends itself to ready interpretation

3  by lay judges.  As discussed above, the Claim 9 element at issue requires that there be a means for

4  "determining a first distance between the seeker unit and said object, a second distance between said

5  seeker unit and said object, and a relative change in distance."  (Doc. 15, Exh. 1, p. 10).  Claim 9

6  contains no language as to how the distances are determined or compared or what specific transmitter-

7  receiver technology is used to make those calculations.  Rather, the ordinary meaning of Claim 9's

8  plain language describes a function of a device that determines a first distance between a receiver and a

9  transmitter, a subsequent distance between the receiver and a transmitter, and whether that distance has

10  increased or decreased.  Claims 1 and 7 of the '457 patent also support this interpretation of Claim 9 in

11  discussing the determination of a first distance, a second distance, and "comparing said first distance to

12  said second distance to determine a change in distance, and whether said second distance is greater or

13  less than said first distance."  *Id*.  Neither party submits evidence that contradicts this interpretation.

14  Therefore, this Court construes the portion of Claim 9 at issue here as a function limitation whereby a

15  device determines a first distance between a receiver and a transmitter, a subsequent distance between

16  the receiver and a transmitter, and whether the second distance is greater or less than said first distance.

17                    **a.        Prior Art**

18        Plaintiffs state in their '457 patent that "[a] number of modern variations of the game of hide

19  and seek have been developed and/or patented to incorporate modern electronic technology into

20  devices to be used to play the game."  (Doc. 15, Exh. 1, p. 5).  However, Plaintiffs only referenced two

21  prior art patents in their application for the '457 patent.  Defendant submitted a number of patents that

22  relate to Plaintiffs' '457 patent and allegedly render Claim 9's "calculating means" element invalid as

23  obvious.

24        U.S. Patent 4,935,907 to Mark B. Friedman ("Friedman patent") was filed in 1988 and

25  describes an electronic homing system.  The Friedman patent describes its invention as "[a] homing

26  system for directing the user (human or mobile robot) to one of a plurality of objects and/or

27  locations[.]"  (Doc. 72, Exh. 9, p. 5).  "The remote modules are placed with objects or at locations to

28  which the system user may desire to be led."  *Id*.  "Typically, the mobile unit is designed to be hand

7

held and has a handle." *Id*. "A programmed digital microchip computer generates an internal representation of the distance between the receiving transducer and the selected remote module[.]" *Id*. "The computer compares subsequent representations of the distances to determine if the mobile module is moving closer or farther away from the selected remote module." *Id*. "The mobile module includes an indicator for indicating to the user whether the distance to the selected remote module is increasing or decreasing as the mobile module is moved." *Id*.

Specifically, independent Claim 1 of the Friedman patent discloses "[a] homing system for directing the user to one of a plurality of locations comprising … a mobile module comprising … means for generating an internal representation of the distance between the receiving means and the selected module[,] … means for comparing subsequent representations of the distances, [and] output means indicating to the user whether the distance is increasing or decreasing continuously as the mobile module is moved[.]" *Id*. at p. 10.

U.S. Patent 6,344,797 to Hosny ("Hosny patent") was issued in 1999 and relates to a digital electronic locater. Claims 1, 3, 4, 14, 16, and 17 of the Hosny patent disclose "[a]n apparatus for locating an object/animal/person within a vast area, comprising a portable transmitter unit carried by the searcher or locator and an object/animal mounted or person carried receiver unit … wherein said receiver unit audio and visual alerting means intensity increases as the searcher comes closer to an object/animal/person … being located." (Doc. 72, Exh. 6, pp. 13-14).

Plaintiffs name U.S. Patent 6,311,982 to Lebensfeld ("Lebensfeld patent") as a cited reference in their '457 patent. U.S. Patent No. 6,311,982 (filed Feb. 7, 2000). The Lebensfeld patent relates to a "hide and find toy game" using wireless transmitter and receiver technology. *Id*. Claim 1 of the Lebenfeld patent discloses "a first game element to be hidden in a play area" and "a second, portable game element to be carried by a player," where one game element incorporates a wireless transmitter and one game element incorporates a wireless receiver. *Id*. Claim 2 of the Lebensfeld patent discloses "the second portable game element including a wireless receiver having an actuable sound generator to generate a sound informing the player that said second portable game element has been brought closer than a predetermined distance from said first hidden game element[.]" *Id*. Claim 3 of the Lebensfeld patent refers to Claim 2 and discloses that "the wireless receiver receives and

8

1   compares the transmitted signal with a threshold level to determine whether or not the second portable

2   game element has been brought closer than the predetermined distance from said first hidden game

3   element." *Id.*

4                               **b.          Differences Between Claimed Invention and Prior Art**

5          On its face, the technology claimed in the 1988 Friedman patent appears to cover the

6   invention claimed in the "calculating means" element of Plaintiffs' Claim 9.

7          The "calculating means" element of Claim 9 describes the function of a game device that

8   calculates "a first distance between the seeker unit and said [hidden] object, a second distance between

9   said seeker unit and said object, and a relative change in distance[.]"  (Doc. 15, Exh. 1, p. 10).  The

10  prior art in Claim 1 of the Friedman patent, in relevant part, describes the function of a device that

11  "generat[es] an internal representation of the distance between the receiving means and the selected

12  module[,] … compar[es] subsequent representations of the distances, [and] indicat[es] to the user

13  whether the distance is increasing or decreasing continuously as the mobile module is moved[.]"  (Doc.

14  72, Exh. 9, p. 10).  Claim 1 of the Friedman patent therefore discloses a calculating means through

15  which a mobile receiver device determines an initial distance between the receiver unit and the

16  transmitter unit, one or more subsequent distances between the receiver unit and the transmitter unit,

17  and a relative change in that distance.  Moreover, Plaintiffs assert and Claim 9's plain language shows

18  that it "is not concerned with the how or the means of calculating a distance[.]"  (Doc. 69, p. 10).

19  Therefore, even if the technology used in the Friedman patent differs from that in the '457 patent, the

20  '457 patent's "calculating means" element is still invalid as obvious because it "simply requires that

21  the [invention] determine at least a first and a second distance and determine a relative chance in

22  distance."  *Id.*  Further, like the '457 patent, the Friedman patent's mobile receiver unit indicates to the

23  user whether the distance between the receiver unit and the transmitter unit is increasing or decreasing

24  as user moves the mobile receiver unit.

25          Plaintiffs' only argument in opposition to this is an attempt to distinguish the Friedman

26  patent by arguing that, unlike the Friedman patent, Plaintiffs' '457 patent "discloses how to use known

27  methods of determining distances using a transmitter, a receiver, and a computing device in order to

28  make an enhanced Hide 'N Seek game."  (Doc. 81, p. 22).  However, Plaintiffs' claim in this action is

                                                        9

that Defendant's Care Bear doll infringes on the "calculating means" element of Claim 9.[2]  In fact, Plaintiffs' arguments and evidence in its summary adjudication filings focus on the technical functionality of Defendant's product to show that the mobile receiver unit incorporated in the Care Bear doll determines a first, a second distance, and a relative chance in distance, and therefore infringes the "calculating means" element of Claim 9 of the '457 patent.  As discussed above, the Friedman patent renders the "calculating means" element obvious if not duplicative.

Plaintiffs at no point claim that Defendant infringes Plaintiffs' application of known transmitter-receiver technology to make an enhanced hide-and-seek game.  As Plaintiffs themselves acknowledge in their '457 patent, "[a] number of modern variations of the game of hide and seek have been developed and/or patented to incorporate modern electronic technology into devices to be used to play the game."  (Doc. 15, Exh. 1, p. 5).  Further, Plaintiffs gain no ground by pointing out that their patent pertains to a hide-and-seek game while the Friedman patent does not.  As the Federal Circuit has made clear, "[t]he scope of what is taught by a prior art apparatus extends not only to the apparatus itself, but also to the obvious methods of use suggested by the structure of that apparatus."  *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1375 (Fed. Cir. 2003) (citing *In re Lonardo*, 119 F.3d 960, 968 (Fed. Cir. 1997)).

### c.    Other *Graham* Factors

The determination of obviousness also involves findings as to the level of ordinary skill in the art and any relevant secondary considerations, including commercial success, long felt but unsolved needs, and failure of others.  *Graham*, 383 U.S. at 17.

"To determine the level of ordinary skill in the art, courts must consider the educational level of the inventor, the educational level of those who work in the relevant industry, and the sophistication of the technology involved."  *Tokyo Keiso Co., Ltd. v. SMC Corp.*, 533 F. Supp. 2d 1047, 1059 (C.D. Cal. 2007) *aff'd*, 307 F. App'x 446 (Fed. Cir. 2009) (citing *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991)).  The parties make no arguments and submit no evidence as to the educational level either of the inventors or of those who work in the relevant industry.  Defendant

---

[2] It appears that Plaintiffs attempt to claim Defendant's product infringed on a functionality element of Plaintiffs' patent while admitting that said function is a "known method" of determining distances using a transmitter-receiver technology. (Doc. 81, p. 22).

submitted patents that allegedly relate to the technology involved in Claim 9 of Plaintiffs' '457 patent. A review of those patents show the technology involved in Claim 9 to be relatively rudimentary.  Most if not all of the related patents describe technology that is more sophisticated than the technology involved in Claim 9.  For example, the digital electronic locater described in the Hosny patent uses transmitter-receiver technology not only to alert the searcher as he or she gets closer to the object being located, but also to "provide information to the searcher regarding the direction of an object/animal/person" being located as well as to "provide information to the person being searched regarding the direction of the searcher" where the object being located is a person.  (Doc. 72, Exh. 6, p. 10).  Further, Plaintiffs themselves acknowledge that the '457 patent involves only "known methods of determining distances using a transmitter, a receiver, and a computing device[.]"  (Doc. 81, p. 22). Therefore, this factor weighs in favor of obviousness.

The parties make no arguments and submit no evidence about the commercial success of Plaintiffs' invention or the failure of others.  Plaintiffs attempt to argue that their invention solves a problem of adults having to play hide-and-seek with children by enabling the game to be played by one player once the toy is hidden.  (Doc. 15, Exh. 1, p. 6).  However, the application of the technology described in many of the related patents to a hide-and-seek game also would enable a single player to seek the hidden object or objects once they are hidden.  In fact, the Friedman patent's invention not only would allow the game to be played by just a seeker once the object is hidden, but also would allow the game to be played by just a "mobile robot."  (Doc. 72, Exh. 9, p. 5).  Therefore, this factor is insignificant to the obviousness analysis here.  To the extent it holds any weight, it weighs in favor of a finding of obviousness.

Because an analysis of the *Graham* factors shows by clear and convincing evidence that the Plaintiffs' patent as to Claim 9's "calculating means" element is obvious, the '457 patent as to that element is invalid.  In light of the patent's invalidity, the parties' arguments and evidence show no genuine issue of material fact as to Plaintiffs' infringement claims that necessitates a trial.  Therefore, Plaintiffs' motion for summary adjudication is DENIED and Defendant's motion for summary adjudication is GRANTED.

    **2.**       **Direct Infringement**

11

1   Defendant as a matter of law does not infringe on Plaintiffs' patent as to the "calculating

2   means" element of Claim 9 because Plaintiffs' patent as to that element is invalid.  However, even if

3   Plaintiffs' patent as to the "calculating means" element is valid, Plaintiffs nonetheless fail to show that

4   Defendant's product infringes upon it.

5   "[L]iteral infringement requires a showing that every limitation of at least one claim 'reads

6   on' or covers the accused device[.]"  *Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d

7   1141, 1154-55 (W.D. Wash. 2008) (citing *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859

8   F.2d 878, 889 (Fed. Cir. 1988)). "To establish literal infringement, every limitation set forth in a claim

9   must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d

10  1570, 1575 (Fed. Cir. 1995); *see also, Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir.

11  1994) ("For literal infringement, each limitation of the claim must be met by the accused device

12  exactly, any deviation from the claim precluding a finding of infringement.").  "Accordingly, a claim

13  cannot be literally infringed if any claim element or limitation is missing entirely from the accused

14  product." *Veritas*, 562 F. Supp. 2d at 1155 (citing *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534,

15  1539 (Fed. Cir. 1991).

16  Infringement under the doctrine of equivalents requires "that the fact finder determine

17  whether differences between particular elements of the accused device and the asserted claims are

18  insubstantial." *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1467 (Fed. Cir. 1998) (citing

19  *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 117 S.Ct. 1040, 1054, (1997)); *see also, Alpex*

20  *Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1222 (Fed. Cir. 1996) ("Under § 112, the

21  concern is whether the accused device, which performs the claimed function, has the same or an

22  equivalent structure as the structure described in the specification corresponding to the claim's means.

23  Under the doctrine of equivalents, on the other hand, the question is whether the accused device is only

24  insubstantially different than the claimed device.") (internal citations omitted).  "What constitutes

25  equivalency must be determined against the context of the patent, the prior art, and the particular

26  circumstances of the case." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609

27  (1950).

28  As discussed above, the element of Claim 9 at issue here is a function limitation whereby a

12

1   device determines a first distance between a receiver and a transmitter, a subsequent distance between

2   the receiver and a transmitter, and whether the second distance is greater or less than said first distance.

3   Defendant's Care Bear Doll, however, uses transmitter-receiver technology to determine whether the

4   receiver is within a predetermined distance of the transmitter.  (Doc. 80, Exh. A, p. 9).  Unlike the

5   function described in Claim 9, Defendant's toy cannot and does not determine whether a subsequent

6   distance between the transmitter and the receiver is greater or less than an initial distance between the

7   transmitter and the receiver unless the receiver moves across one of two boundaries of the

8   predetermined distances.  (Doc. 80, Exh. A, pp. 15-16) ("The voice messages do not appear to have

9   any correlation to the distance the Finder is from the Secret Bear as long as the Finder is greater than

10  20 feet from the Secret Bear […] The voice messages and the light blink rate do not appear to have any

11  correlation to the distance the Finder is from the Secret Bear as long as the Finder is within the 3 to 20

12  feet range from the Secret Bear.").  In fact, this function of Defendant's toy seems similar, if not

13  identical, to the function described in Claims 1, 2, and 3 of the Lebensfeld patent, which Plaintiffs

14  name as a cited reference in their '457 patent.  As discussed above, the Lebensfeld patent also relates

15  to a hide-and-seek game using wireless transmitter-receiver technology where "the wireless receiver

16  receives and compares the transmitted signal with a threshold level to determine whether or not the

17  second portable game element has been brought closer than the predetermined distance from said first

18  hidden game element."  By contrast, Claim 9 of the '457 patent makes no use of and has nothing to do

19  with predetermined distances.  Whereas Defendant's toy and the Lebensfeld patent allow the user to

20  locate the hidden object by alerting the user when the user crosses a boundary of predetermined

21  distance from the object, Plaintiffs' patent allows the user to locate the hidden object by informing the

22  user whether the user has moved closer to or farther away from the hidden object whenever the user

23  moves.

24          Therefore, Defendant's Care Bear toy does not literally infringe on and has substantial

25  differences in function from Claim 9 of Plaintiffs' patent even if Plaintiffs held a valid patent to Claim

26  9.

27      **3.      Motion to Amend**

28          Plaintiffs also seek leave from the Court to amend the operative complaint.  However,

13

1  Plaintiffs fail to show that their proposed amendment meets the federal standard for obtaining
2  discretionary leave to amend.

3        "It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within
4  the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330
5  (1971) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).   Federal procedure states that leave to
6  amend shall be freely given "when justice so requires." Fed. R. Civ. P. 15(a).   "In the absence of any
7  apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the
8  movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to
9  the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave
10  sought should, as the rules require, be 'freely given.'"   *Foman*, 371 U.S. at 182.   District courts may
11  not "outright refus[e] to grant the leave without any justifying reason appearing for the denial." *Id.*

12        As discussed above, the operative complaint does not allege that Defendants directly
13  infringed Claim 1 of Plaintiffs' '457 patent, but Plaintiffs move for summary judgment as to direct
14  infringement of Claims 1 and 9.   In their motion to amend the complaint, Plaintiffs state that they seek
15  leave to file a second amended complaint "primarily to clarify the Court's confusion as to why Claim
16  No. 1 was included in Plaintiff's Motion for Summary Judgment." (Doc. 87, p. 2).

17        Counsel misrepresents the nature, extent, and purpose of the proposed amendment to the
18  Court.   The Proposed Second Amended Complaint shows that counsel seeks to add not only direct
19  infringement claims as to Claim 1 but also direct infringement claims as to each of the fifteen Claims
20  contained in the '457 patent as well as a cause of action for inducement of infringement as to each of
21  the fifteen Claims contained in the '457 patent under 35 U.S.C. § 271(b) and a cause of action for
22  contributory infringement under 35 U.S.C. § 271(c).   (Doc. 87, Exh. A, pp. 9-13).

23                    **i.        Prejudice to Opposing Party**

24        "'Undue prejudice' means substantial prejudice or substantial negative effect[.]"   *SAES*
25  *Getters S.p.A. v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2002).   "[T]he Ninth Circuit has
26  found such substantial prejudice where the claims sought to be added 'would have greatly altered the
27  nature of the litigation and would have required defendants to have undertaken, at a late hour, an
28  entirely new course of defense.'"   *Id.* (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d

14

1074, 1079 (9th Cir. 1990).  "[T]he resulting prejudice to the opposing party is by far the most important and most common reason for upholding a district court's decision to deny leave to amend." *In re Circuit Breaker Litig.*, 175 F.R.D. 547, 551 (C.D. Cal. 1997) (citing *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1316 (8th Cir. 1990); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990); *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973)).

Plaintiffs argue that Defendant would not be prejudiced by the amendment.  According to Plaintiffs, the amendment would not result in prejudice to Defendant because "[s]ince the outset of this case, Plaintiffs have pled that there are issues relating to Jakks having directly infringed, either literally or under the doctrine of equivalents, and continuing to directly infringe on Patent No. '457."  (Doc. 87, p. 7).  However, as discussed above, the Proposed Second Amended Complaint adds two entirely new causes of action that are not direct infringement and require substantively different analyses.

Plaintiffs further argue that "it is patently evident that Jakks will not suffer undue prejudice from the filing of Plaintiffs' Second Amended Complaint because … the specific elements of each claim are listed in the First Amended Complaint, Proposed Second Amended Complaint AND specifically laid out in Plaintiffs' Motion for Summary Judgment[.]"  Counsel again misstates the facts before the Court.  The first amended complaint and Plaintiffs' summary judgment filings only discuss direct infringement as to no more than two of the Claims in the '457 patent.  Nowhere in the operative complaint or in the summary judgment filings does either party mention or analyze inducement of infringement, contributory infringement, or direct infringement as to the remaining thirteen Claims in the '457 patent.  Plaintiffs' arguments as to a complaint that was never filed are meritless.  Further, "[t]he prejudice to the opposing party is greater where the tardy amendment will require a reopening of discovery."  *C.F. v. Capistrano Unified Sch. Dist.*, 656 F. Supp. 2d 1190, 1199 (C.D. Cal. 2009) *aff'd sub nom., C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975 (9th Cir. 2011).

Because this amendment would result in "substantial negative effect" to Defendant by substantially expanding the issues in this litigation and requiring Defendant to undertake a new course to defense to address thirteen additional Claims and two entirely new causes of action at this late hour, granting Plaintiffs' motion to amend would unduly prejudice Defendant.  *SAES*, 219 F. Supp. 2d at 1086.  This factor weighs heavily against granting Plaintiffs' motion.  *In re Circuit Breaker Litig.*, 175

15

1    F.R.D. at 551.

2              ii.        **Futility**

3         Even if Plaintiffs actually seek to amend the operative complaint only to include a direct

4    infringement claim as to Claim 1 of the '457 patent as Plaintiffs' motion suggests, the amendment

5    would be futile.

6         "A motion for leave to amend may be denied if it appears to be futile or legally insufficient."

7    *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (citing *Gabrielson v. Montgomery*

8    *Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986)).  "[A] proposed amendment is futile only if no set of

9    facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient

10   claim or defense." *Id.* (citing *Baker v. Pacific Far East Lines, Inc.*, 451 F.Supp. 84, 89 (N.D. Cal.

11   1978); *see generally*, 3 J. Moore, Moore's Federal Practice ¶ 15.08[4] (2d ed. 1974) (stating that the

12   proper test to be applied when determining the legal sufficiency of a proposed amendment is identical

13   to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)).

14        Amending the operative complaint to include direct infringement allegations as to Claim 1 of

15   the '457 patent is futile because Plaintiffs cannot overcome the obviousness of Claim 1 or Defendant's

16   non-infringement of Claim 1.

17        Claim 1, like Claim 9, lends itself to ready interpretation by lay judges.  *Phillips*, 415 F.3d at

18   1314.  Claim 1 discloses, in substantial part, "[a] method for playing an enhanced hide and seek game

19   … comprising the steps of … determining a first distance between said seeker unit and said transmitter

20   unit; determining a second distance between said seeker unit and said transmitter unit; comparing said

21   second distance to said first distance to determine a change in distance and whether said second

22   distance is great or less than said first distance; [and] communicating a game message from said seeker

23   unit to the game participant regarding said change in distance[.]" (Doc. 15, Exh. 1, p. 10).

24        Prior art patents currently before the Court render Claim 1 obvious if not duplicative.  The

25   Friedman patent discloses locating an object through a homing system where a device "generat[es] an

26   internal representation of the distance between the receiving means and the selected module[,] …

27   compar[es] subsequent representations of the distances, [and] indicat[es] to the user whether the

28   distance is increasing or decreasing continuously as the mobile module is moved[.]" (Doc. 72, Exh. 9,

                                                    16

p. 5).  The Hosny patent discloses "[a]n apparatus for locating an object/animal/person within a vast area, comprising a portable transmitter unit carried by the searcher or locator and an object/animal mounted or person carried receiver unit … wherein said receiver unit audio and visual alerting means intensity increases as the searcher comes closer to an object/animal/person … being located." (Doc. 72, Exh. 6, pp. 13-14).  These patents on their face cover the invention described in Claim 1.  Further, as discussed above, related prior art patents describe technology that is generally more sophisticated than, but at least as sophisticated as, the technology involved in Claim 1 of the '457 patent.  No set of facts that would render Claim 1 of Plaintiffs' patent non-obvious.  In fact, the submission of additional related prior art patents only would render Claim 1 more, not less, obvious.

Like Claim 9, Claim 1 also is not subject to direct infringement by Defendant's Care Bear doll through either literal infringement or the doctrine of equivalents.  The above analysis of Claim 9's non-infringement applies to Claim 1 as well.  Unlike the invention described in Claim 1, Defendant's toy cannot and does not determine whether a subsequent distance between the transmitter and the receiver is greater or less than an initial distance between the transmitter and the receiver unless the receiver moves across one of two boundaries of the predetermined distances.  (Doc. 80, Exh. A, pp. 15-16).  By contrast, Claim 1 of the '457 patent makes no use of and has nothing to do with predetermined distances.  Whereas Defendant's toy and the Lebensfeld patent allow the user to locate the hidden object by alerting the user when the user crosses a boundary of predetermined distance from the object, Claim 9 and Claim 1 of Plaintiffs' patent allow the user to locate the hidden object by informing the user whether the user has moved closer to or farther away from the hidden object whenever the user moves.  Therefore, no set of facts could be proved to constitute a valid and sufficient claim that Defendant's Care Bear toy literally or by doctrine of equivalents infringes on Claim 1 of Plaintiffs' patent even if Plaintiffs held a valid patent to Claim 1.

### iii.    Other Factors

Under *Forman*, districts courts also may consider undue delay and dilatory motive by the moving party in assessing motions to amend.  *Foman*, 371 U.S. at 182.  Here, Plaintiffs seek to file a nearly completely new operative complaint some two years after filing their original complaint, after the parties engaged in discovery and fully briefed the summary judgment proceeding from both sides,

17

1  and after this Court was well into adjudication of the summary judgment proceedings.  "[T]he delay of

2  nearly two years [after filing the original complaint], while not alone enough to support denial, is

3  nevertheless relevant."  *Morongo*, 893 F.2d at 1079 (citing *Loehr v. Ventura County Community*

4  *College Dist.*, 743 F.2d 1310, 1319–20 (9th Cir. 1984)).

5         In addition to the *Forman* factors stated above, "it is appropriate for the court to consider

6  judicial economy and the most expeditious way to dispose of the merits of the litigation."  *Dussouy v.*

7  *Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981) (citing *Zenith Radio v. Hazeltine Research*,

8  401 U.S. 321, 329 (1971)).  This concern is especially pertinent here, as this Court routinely advises

9  counsel and parties that "[j]udges in the Eastern District of California carry the heaviest caseload in the

10  nation, and this Court is unable to devote inordinate time and resources to individual cases and

11  matters."  Preliminary Statement to Parties and Counsel, *supra*.

12         Moreoever, while Plaintiffs do not exhibit a dilatory motive in seeking to amend their

13  complaint, they also offer no explanation, other than counsel's admitted negligence, for their delay in

14  filing their motion to amend.

15         Because allowing Plaintiffs to submit their Proposed Second Amended Complaint would

16  result in undue prejudice to Defendant, cause undue delay, and is contrary to judicial economy, and

17  because allowing Plaintiffs to amend their complaint to include direct infringement allegations as to

18  Claim 1 would be futile, Plaintiffs' motion for leave to amend the operative complaint is DENIED

19  WITH PREJUDICE.

20                              **CONCLUSION AND ORDER**

21         For the reasons discussed above, this Court:

22     1.  DENIES Plaintiffs Conte and Reichman's motion for summary judgment as to the causes of

23          action in the first amended complaint;

24     2.  GRANTS Defendant Jakks' motion for summary judgment as to the causes of action in the

25          first amended complaint;

26     3.  DENIES WITH PREJUDICE Plaintiffs Conte and Reichman's motion for leave to amend

27          the first amended complaint;

28     4.  ORDERS the Clerk of Court to enter judgment pursuant to Fed. R. Civ. P. 54(b) in favor of

Defendant Jakks and against Plaintiffs Conte and Reichman as to each cause of action in Plaintiffs' first amended complaint as the Court determines that there is no just reason for delay; and

5. ORDERS Counsel for Jakks by 5:00 PM on November 6, 2013 to file a status statement concerning its intent regarding the common law counterclaims.  If the intent is to proceed to trial, serious consideration should be given by all parties to consent to Magistrate Judge adjudication and jurisdiction.  This case is the fourth of five trials set for trial on December 10, 2013.  This, and all other trials set before the District Judge will **trail** until the Court becomes available and will not be continued.  Magistrate Judge consent cures the counsel calendar concern.

IT IS SO ORDERED.

Dated:   __**November 5, 2013**__          _____**/s/ Lawrence J. O'Neill**
                                                        UNITED STATES DISTRICT JUDGE

19

# Addendum 2

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**JUDGMENT IN A CIVIL CASE**

**SHELLY CONTE, ET AL.,**

CASE NO: **1:12–CV–00006–LJO–GSA**

v.

**JAKKS PACIFIC, INC.,**

_____

**XX** –– **Decision by the Court.** This action came to trial or hearing before the Court. The issues
have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

   **THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE
   COURT'S ORDER FILED ON 11/5/2013**

**Marianne Matherly**
Clerk of Court

ENTERED:   **November 5, 2013**

by:  /s/  C. Marrujo
                              Deputy Clerk

A20

# Addendum 3

Case 2:11-cv-00479-PGS -ES   Document 1 
US006494457B2

(12) **United States Patent**            (10) **Patent No.:**      **US 6,494,457 B2**
Conte et al.                             (45) **Date of Patent:**         **Dec. 17, 2002**

(54) **ENHANCED HIDE AND SEEK GAME AND METHOD OF PLAYING GAME**

(76) Inventors: **Shelly Conte**, 9837 N. Granville Ave., Fresno, CA (US) 93720; **Cindy Reichman**, 9837 N. Granville Ave., Fresno, CA (US) 93720

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/915,940**

(22) Filed: **Jul. 25, 2001**

(65) **Prior Publication Data**

US 2002/0014742 A1 Feb. 7, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/220,946, filed on Jul. 26, 2000.

(51) Int. Cl.[7] .............................................. **A63H 5/00**
(52) U.S. Cl. ...................................................... **273/460**
(58) Field of Search ............................. 273/460; 463/1, 463/40, 41, 42

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,311,982 B1 * 11/2001 Lebensfeld et al. ......... 273/460
6,364,315 B1 * 4/2002 Velke, III ................... 273/460

* cited by examiner

*Primary Examiner*—Marguerite McMahon
(74) *Attorney, Agent, or Firm*—Richard A. Ryan

(57)               **ABSTRACT**

An enhanced game of hide and seek where the game participant searches for a hidden object having a transmitter device inside or attached to the object. The game participant utilizes a seeker unit that determines the distance between the object and the participant before and after the participant moves. The seeker unit uses that information to determine whether the participant is moving closer to or further away from the object and then communicates useful information to the game participant to assist the participant in finding the object. The participant interacts with the seeker unit to use and develop his or her logical reasoning skills in searching for the hidden object. The object can be a doll, stuffed animal, toy or any variety of other objects suitable for hiding and fun for finding.

**15 Claims, 3 Drawing Sheets**



J 000315

Case 2:11-cv-00479-PGS -ES   Document 1-1   Filed 01/26/11   Page 2 of 9 PageID: 16

**U.S. Patent**        Dec. 17, 2002        Sheet 1 of 3        US 6,494,457 B2



FIG. 1

**J 00031**

Case 2:11-cv-00479-PGS -ES   Document 1-1   Filed 01/26/11   Page 3 of 9 PageID: 17

**U.S. Patent**        Dec. 17, 2002        Sheet 2 of 3        US 6,494,457 B2



FIG. 2



FIG. 3

J 00031

Case 2:11-cv-00479-PGS -ES    Document 1-1    Filed 01/26/11    Page 4 of 9 PageID: 18



FIG. 4

**J 00031**

US 6,494,457 B2

1

## ENHANCED HIDE AND SEEK GAME AND METHOD OF PLAYING GAME

### REFERENCE TO RELATED PATENTS

This patent claims priority based on U.S. Provisional Application No. 60/220,946 filed Jul. 26, 2000.

### BACKGROUND OF THE INVENTION

#### A. Field of the Invention

The field of the present invention relates generally to children's toys and games. More particularly the present invention relates to those games that are enhanced versions of the game of hide and seek. Even more particularly, the present invention relates to such games that utilize an object, such as a doll, stuffed animal, toy or other such object, that is hidden and which communicates its relative position to the person seeking the toy or object.

#### B. Background

The game of hide and seek has likely been around for a very long time. In fact, most people have played the game of hide and seek, either when they were a child or as an adult in conjunction with children. The standard game of hide and seek requires two or more participants with one participant being the seeker and the other participant(s) hiding so the seeker cannot easily find them. Typically, the seeker will hide his or her eyes to give the other participants a chance to hide. Once the allotted time has gone by for the others to hide, the seeker will begin seeking out the other participants. When the seeker is able to find and touch another participant, that participant becomes the next seeker and the game is repeated. There are numerous variations of the standard game where rules are made to increase or decrease the difficulty of play. One such variation on the standard hide and seek is where one person (often a parent or older sibling) hides an object, such as a doll, stuffed animal or toy, so that another person (i.e., a child) can try to find the object. Typically, the person who hid the object will watch the person seeking the object and give clues as to the location of the hidden object, usually in reference relative to the seeker's position and often in the vague form of whether the seeker is cold, warm or hot. Based on the clues, the seeking participant uses his or her logic skills to determine the object's location.

One limitation of the standard game of hide and seek is that the game requires at least two persons (whether both are children or one is a parent or other adult) to participate, one as the seeker and one who hides. If only two participants are playing the standard hide and seek game, the one hiding is unable to give any clues as to his or her position without the sound of the clues, as opposed to the words themselves, giving away the hider's location. In fact, with only two people playing hide and seek, the modified game (i.e., where an object is hidden and clues are given) is usually the game of choice for younger children due to their inability to find a well-hidden hider. Naturally, without a second person to do the hiding or seeking, either the standard or modified game of hide and seek cannot be played. With young children at home, often it is the parent who plays as the other participant. Even well meaning parents, however, are generally limited on the amount of time and patience they have available for playing such a game. Usually, the parent will tire of the game before the child does.

For traditional hide and seek games, the number of players to make the game fun generally depends on the size of area where the game is played and the number of places

2

to hide. If the area is small with not too many places to hide, the game is generally more fun with fewer players. Otherwise, the game is not very much fun because it is too easy to find the hidden participants. In contrast, if the playing area is large with many places to hide, the game is generally much more fun with more participants. This is particularly true for a game being played in a large area with only a young seeker and a single hidden child, which would be too difficult to be fun.

A number of modern variations of the game of hide and seek have been developed and/or patented to incorporate modern electronic technology into devices to be used to play the game. One such game is "Hide 'n Sneak" that utilizes a seeker unit and one or more "hider" units that are worn by the person seeking and the person hiding, respectively. When the seeker comes within a preset distance of the hider, the seeker unit picks up a signal transmitted by the hider unit to let the seeker know he or she is close to a person hiding. As the seeker gets closer to the hidden person, the seeker unit uses a variety of lights and/or sounds to indicate the relative closeness to the person hiding. As such, the game basically replaces visual seeking with sonar-type seeking. Another game is called "Hide 'n Squeak" by Milton Bradley. In this game, an object such as a kitten or puppy with a transmitter inside is hidden. The object transmits a "cute" sound every few seconds for the child to follow. Skill level is adjusted by setting how often the object transmits the sound. Other than listening for the sound of the object, there is no other interaction between the seeker and the object. Another available game utilizes the Freddie Fish® character in a toy format, treasures for hiding and a tracking device. The character toy emits different phrases to guide the seekers to the hidden treasures. Other than listening for the phrases emitted by the toy, no other interaction takes place between the child and the toy. One common aspect of the above-mentioned games is that none of them provide much of an opportunity for the seeker to use and develop his or her logic skills. The interaction between the seeker and the hidden objects is generally very minimal and the seeker merely has to follow the sound of the devices to determine where they are located.

U.S. Pat. No. 4,961,575 to Perry discloses a hide and seek game that utilizes a radio receiver for the seeker and radio transmitters for those who are hiding. Each transmitter emits a radio signal that is picked-up by the receiver, which measures the field strength of the cumulative signal field generated by the transmitters. The receivers and transmitters can be configured in the form of a wrist watch sized device to be worn on the players' person. The transmitters also include a feature to allow them to be temporarily turned off. This game, like the traditional game of hide and seek, requires two or more participants. In addition, the game devices appear to be less suitable for very young children due to the need to understand the effect of multiple radio signals. A similar type of game is disclosed in U.S. Pat. No. 5,942,969 to Wicks. This patent describes a treasure hunt type of game that utilizes pagers and a wireless paging system. The participants decipher clues to determine which location they need to go to next. Once there, they signal the base pager station that they are there and then they receive the next clue. This game requires interaction with a wireless paging system and is not configured for young children.

While the foregoing describes certain hide and seek and related games that are available or have been previously patented, none of the games provide a hide and seek game that can be played by a single participant (once the object is hidden) and which interacts with the participant. The ability

J 00031

US 6,494,457 B2

3

to provide a participant, particularly young children, with a hide and seek game that both entertains and helps develop the participant's thinking abilities would be beneficial to most parents. As is well known, a child playing by his or herself or even with other children often becomes bored and wants a parent to interact in a game with the child or children. The level of interaction desired by the child or children often is not possible due to work or other activities engaged in by the parent. Although the parent wants to keep the child or children busy, he or she desires to have something that interacts with the child and makes the child use and further develop thinking skills. What is needed, therefore, is a hide and seek game and interactive apparatus for use with the game that can be played by one or more young children and which provides a level of interaction with the child or children that encourages the child to utilize his or her deductive reasoning skills.

### SUMMARY OF THE INVENTION

The enhance hide and seek game and method of playing the game of the present invention provides the benefits and solves the problems identified above. That is to say, the present invention discloses a new and useful hide and seek game and method that can be played by one or more participants, such as young children, and which interacts with the participants playing the game to challenge them to utilize their deductive reasoning skills to find a hidden object. The present invention is easy to play and is suitable for use with a variety of commonly available objects as the object to be hidden and utilizes commonly available technology. The preferred embodiment of the present invention is set forth in the discussion below. However, it should be understood that the principles set forth below with regard to the present invention are equally adaptable to other configurations.

In its preferred configuration, the enhanced hide and seek game of the present invention utilizes an object to be hidden and a seeker unit to be worn or held by the participant seeking the hidden object. The object to be hidden has a transmitter unit either built into the object, attached to the object or otherwise associated with the object. In the preferred embodiment of playing the game the transmitter unit associated with the object is activated and the object is hidden so the game participant will have to find it. The seeker unit is activated and communicates an initialization message (such as laughing, steps running away or the like) to the game participant. The microprocessor in the seeker unit then determines a first distance between the participant and the object based on the first position of the participant. After the participant moves, he or she can initiate a position request by speaking into the seeker unit or pushing a button, flipping a switch or otherwise activating a device on the seeker unit to cause it to determine a second distance, based on the participant's second position, between the seeker unit and the transmitter unit. The microprocessor in the seeker unit compares the second distance to the first distance to determine a relative change in distance and whether the second distance is greater or less than the first distance. Based on that determination, the seeker unit communicates a game message to the game participant regarding the change in distance (i.e., whether he or she is getting closer or further away from the object). The participant then moves again and repeats the procedure for the next position he or she desires to check until the object is found. When the participant gets very close to the object, the seeker unit can communicate an end message (such as "you've found me" or the like) to indicate that the participant has found the object.

4

In the preferred embodiment of the game of the present invention, the game comprises an object capable of being hidden, a transmitter unit associated with the object and a seeker unit associated with the game participant. The transmitter unit is configured to transmit a signal generally outward from the object such that it can be received by the receiver in the seeker unit. The seeker unit has a microprocessor suitable for determining a relative first distance between the seeker unit (the participant) and the object based on the signal strength of the signal from the transmitter. The microprocessor in the seeker unit also determines the relative second distance between the seeker unit and the object and the relative change in distance between the first distance and the second distance to determine if the participant is generally moving closer to the object or further away from it. The seeker unit also has a speaker for transmitting one or more messages to the game participant, such as an initialization message at the beginning of the game, various game messages during the game to encourage or help the participant find the object and an end message at the end of the game for when the participant finds or is very near the object. In the preferred embodiment, the seeker unit has a voice activated sensor to initiate the distance determination and/or messages. Alternatively, a push button, switch or similar device can be used to activate this procedure.

Accordingly, the primary objective of the present invention is to provide a hide and seek game and apparatus for use therewith having the features generally described above and more specifically described below in the detailed description of the preferred embodiments. It is also an important objective of the present invention to provide a hide and seek game and apparatus that utilizes a doll, toy or other object that can be hidden and then communicates with the seeking child. Yet another important object of the present invention is to provide a method of playing a hide and seek game that can be easily played by one or more participants as the seeker or seekers and which includes an object that interacts with the seeker or seekers to challenge them to find the hidden object. Another object of the present invention is to provide an enhanced hide and seek game and apparatuses that can determine the seeker's relative position to a hidden object and provide clues as to the location of the object. The above and other objectives of the present invention will be explained in greater detail by reference to the attached figures and the description of the preferred embodiment which follows.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings which illustrate the best modes presently contemplated for carrying out the present invention:

FIG. 1 illustrates a participant playing the hide and seek game in accordance with an embodiment of the present invention;

FIG. 2 is an illustration of a transmitter for use with one embodiment of the present invention;

FIG. 3 is an illustration of a seeker unit for use with one embodiment of the present invention; and

FIG. 4 is a block diagram of the apparatus for use with the game of the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to the figures where like elements have been given like numerical designations to facilitate the reader's understanding of the present invention, and particu-

J 0003 0

US 6,494,457 B2

5

larly with reference to the embodiments of the present invention illustrated in the attached figures, the preferred embodiments of the game and apparatus of the present invention are set forth below. Although the preferred embodiments of the present invention are set forth in the following description, it should be understood that the principles set forth below with regard to the present invention are equally adaptable to other configurations.

The preferred embodiments of the game of the present invention, shown generally as 10 in FIG. 1, comprises an object 12 to be hidden and at least one seeker unit 14 to be utilized by the game participant 16, which will be the child, children or other persons'seeking the hidden object 12. In FIG. 1, object 12 is a doll that is hidden behind a group of boxes 17, which is shown merely as an example of place or place in which object 12 can be hidden. Object 12 can be a doll (as shown), stuffed animal, toy, ball or any other type of object that would be appealing for the target game participants 16 to seek out. For instance, object 12 can be a stuffed animal for very young children, a doll for slightly older children, a character toy for older children or a teen or adult-orientated object for teenagers or adults. For purpose of the discussion herein, it should be understood that object 12 can be one of many "toy" or toy-like objects that are suitable for use as the hidden object 12. Other than being modified to incorporate the material required for the present invention, as described below, object 12 can be otherwise configured to be of the type of commonly available dolls, stuffed animals, toys or other objects, including those which resemble or are intended to simulate various characters from books, music, movies or other sources. Also, although perhaps less appealing to certain game participants, object 12 can be as simple as a small metal or plastic housing 20, as shown in FIG. 2. In a preferred embodiment, object 12 is made to be of a size that is reasonably easy to hide, flexible enough (if not very small) to fit behind or in many places and of the type that is fun to play with. For instance, if the game is configured for a young child, then the child can use his or her imagination to pretend object 12 is hiding from him or her.

A transmitter device 18, shown best in FIG. 2, that is capable of continuously transmitting a signal to the seeker unit 14 is associated with object 12 so that the seeker unit 14 can determine how close the game participant 16 is to the hidden object 12, as described in more detail below. As is known in the art, transmitter unit 18 can be incorporated inside object 12, on the outside of object 12 or incorporated into or on an accessory of the object 12 (i.e., if object 12 is a doll, the accessory can be a purse attached to the doll). Naturally, the size of object 12 will, to some extent, dictate the size of the transmitter unit 18. Unlike several of the prior art devices described above, however, the preferred embodiment of the present invention 10 utilizes a transmitter unit 18 that does not speak or emit any sound from object 12. Instead, object 12 merely transmits a signal that is received by the one or more seeker units 14. As described below, this increases interaction with the game participant 16, forces participant 16 to better utilize and develop his or her cognitive thinking skills and makes the game much more fun (by not making it too easy or too hard, particularly for young children). As is known and commonly available in the art, the preferred embodiment of the apparatus of the present invention utilizes a transmitter 18 in object 12 that is battery powered. Object 12 should have an on/off switch 22 somewhere thereon that is operatively connected to transmitter 18 to turn transmitter 18 off to conserve the battery power when the hide and seek game 10 is not being played.

6

As shown in FIGS. 3 and 4, the seeker unit 14 of the preferred embodiment of the present invention 10 has a housing 24 with a receiver 26, a voice activated sensor 28, speaker 30 and associated microprocessor circuitry 32 located in housing 24. Preferably, housing 24 should be small enough to fit into a child's hand, be worn on a strap around the child's neck (as shown in FIG. 1) or be able to be clipped to the child's clothing. Alternatively, seeker units 14 having different sized housings 24 for different sized participants 16 can be made available. One such configuration for the housing 24 is a pager-sized unit that can be made out of a fluorescent plastic material or other materials that appeal to particular participants 16, such as children.

The receiver 26 in housing 24 receives the signal 34 transmitted by transmitter 18 in object 12 and processes the signal 34 to determine the relative proximity of the object 12 to the participant 16. Initially, such as when the seeker unit 14 is activated and/or the participant is at a first position 36, the seeker unit 14 receives the signal 34 from transmitter 18 and determines a first distance 38 between the participant 16 and object 12. This first distance 38 amount is stored in the seeker unit 14. After the participant 16 moves to a second position 40, he or she activates seeker unit 14 causing it to perform another distance calculation at second position 40 to determine second distance 42. Seeker unit 14 then compares the second distance 42 to the first distance 38 and determines a change in distance amount (i.e., second distance 42 minus first distance 38). Seeker unit 14 then processes the change in distance to determine whether the participant 16, who is now at second position 40, is closer or further away from object 12 than he or she was at first position 36. In addition, seeker unit 14 should be configured such that it stores and tracks the most recent proximity determinations to be able to determine if participant 16 is getting relatively closer or farther away from object 12 over a period of several positions. It is not necessary that seeker unit 14 of the present invention 10 be able to calculate the actual distance (i.e., in feet and/or inches) between object 12 and participant 16. Instead, it is only necessary that seeker unit 14 be able to measure the relative strength of signal 34, with the weaker signals 34 indicating seeker unit 14 (and therefore participant 16) is further away from object 12 and stronger signals 34 indicating participant 16 is closer to object 12.

Depending on how close or how far away participant 16 is to object 12, seeker unit 14 will say a game message, comprising one of various phrases, to participant 16 that is appropriate for his or her relative closeness to object 12. For instance, if participant 16 has moved further away from object 12 the seeker unit 14 could speak the phrase "you are cold" or "you are getting colder" (or similar phrases) and as participant 16 moves closer to object 12, the seeker unit 14 could transmit the phrase "you are getting warmer" or "you are warm" or other such phrases to let participant 16 know he or she is getting closer. Later, when participant 16 gets very close to object 12, as determined by the distance calculations, seeker unit 14 can transmit one or more game messages that comprise appropriate phrases such as "I can see your feet" or "wow you are really hot" (depending on the type of object 12) which indicate how very close the participant 16 is to object 12. When participant 16 is basically at object 12, the seeker unit 14 can communicate an end message that says "you have found me" or which squeals in delight or make other indications of having been found (as appropriate for object 12). As with the transmitter 18 in object 12, seeker unit 14 should be battery powered and include an on/off switch 44 to conserve power when the game 10 is not being played.

J 0003 1

US 6,494,457 B2

7

In the preferred embodiment of the present invention 10, participant 16 activates the measurement calculation/ determination by seeker unit 14. In a preferred embodiment, as shown in FIG. 4, the present invention 10 includes a voice activated sensor 28 in seeker unit 14 is configured to initiate the information processing described above. Specifically, when participant 16 speaks into or toward seeker unit 14, seeker unit 14 will receive signal 34 from transmitter 18 and, with microprocessor 32, determine the relative distance between participant 16 and object 12 and the change in distance. The voice activated sensor 28 is preferred due to the enhanced interaction that the participant 16 will have with game 10. After processing the signal 34 and determining distance (first 38 or second 42) and the change in distance, the sensor sends the appropriate signal to the speaker assembly which speaks to participant 16 through seeker unit 14. In another embodiment of the present invention 10, seeker unit 14 can comprise a push button, switch or similar device in addition to or instead of the voice activated sensor 28 to activate, the sequence of determining the relative proximity of the participant 16 to the object 12. When participant 16 has moved to a new position (i.e. the second position 40), he or she would push the button, flip or move the switch or otherwise initiate the above sequence.

Technology related to devices necessary for the transmitter and seeker units is set forth in U.S. Pat. No. 5,495,357 to Osterhout; U.S. Pat. No. 5,686,887 to Chen et al.; U.S. Pat. No. 4,285,158 to Courts et al.; U.S. Pat. No. 4,496,149 to Schwartzberg; and U.S. Pat. No. 5,204,657. To the extent that the disclosures set forth in the above-mentioned patents is necessary to understand the configuration or operation of the present invention, that disclosure is incorporated herein as though fully set forth in the present text.

In use, the transmitter unit 18 in object 12 is activated by turning the switch 22 or other on-off device to the on position and then a parent or another person hides object 12 in a location where it cannot be easily seen. Once hidden, the game participant 16 (i.e., the child who will be seeking object 12) activates seeker unit 14 by turning the switch 44 or other on-off device to the on position and begins looking for object 12. If utilized, the seeker unit 14 communicates an initialization message (such as footsteps running away, laughing and/or a statement such as "come and get me") to the participant 16 through speaker 30 in seeker unit 14. In the preferred embodiment, the game participant 16 speaks into the seeker unit 14 and the voice activated sensor 28 causes the microprocessor 32 to determine a first distance 38 that is associated with the participant's first position 36. Alternatively, the game participant 16 will push a button, flip a switch or other action to initiate the determination of the first distance 38 (and later second distance 42). The participant 16 then moves in a direction he or she believes the object to be. When desired, participant 16 stops at a second position 40 and reinitiates the distance determination by seeker unit 14, causing it to determine the second distance 42. The microprocessor 32 in seeker unit 14 then compares the second distance 42 with the first distance 38 to determine a change in distance and whether the change in distance has resulted in the participant 16 being closer or further away from object 12. The seeker unit 14 then communicates a game message to participant 16 through speaker saying a phrase or set of phrases that is appropriate for the change in distance (i.e., that which is indicative of the relative location of object 12). Participant 16 then moves again and the above process is repeated until the participant 16 finds object 12. As such, the game of the present invention 10 is much more interactive for the participant 16 than the games and meth-

8

ods of the prior art. Because object 12 communicates to the participant 16 only through the seeker unit 14, even when the object 12 is "speaking" to the participant, the game 10 eliminates the prior art problems associated with the sound coming directly from object 12, which makes the game too hard (i.e., the child cannot hear object 12) or too easy (i.e., hearing object 12 gives away its position). Because the sounds come out of the seeker unit 12 itself, the participant 16 can always hear it, but it does not give away the location of the object 12. This allows the game 10 to be challenging up to the end. As such, the enhanced hide and seek game of the present invention 10 provides many benefits over the prior art.

Various modifications can be made to the game 10 of the present invention. For instance, as described above, seeker unit can be programmed to communicate end messages to participant 16 through speaker 30 that indicate how close the participant is to object 12. In addition, seeker unit 14 can be configured to continuously determine the distance between the participant 16 and object 12 and indicate to the participant whether he or she is getting closer or wandering away from object 12. Seeker unit 14 can include a visual screen that displays the various initialization, game and end messages in words in addition or as an alternative to speaking the words through the speaker 30. This would encourage the participant to read and would also allow deaf participants to play the game 10. In addition to speaking or displaying end messages when the participant 16 is close to object 12, seeker unit 14 can also transmit other indications of how close the participant 16 is to object 12. For instance, seeker unit 14 can vibrate, flash a light, ring or transmit other sounds that would indicate to the participant that he or she is very close to or has found object 12. In another alternative embodiment, object 12 could comprise a receiver unit that receives signals from the seeker unit 14 or another type of unit. This alternative configuration would allow the participant's parent or the person who hid the object 12 to speak into the device and cause his or her voice to be heard through the speaker in the object 12. This would be useful to further entice the participant to find the object 12 or to "surprise" him or her upon successfully finding object 12. A variation of this embodiment is that object 12 can be configured such that when the participant, and therefore the seeker unit 14, is very close to object 12 it will automatically speak or issue forth a noise or other indication of being found.

While there are shown and described herein certain specific alternative forms of the invention, it will be readily apparent to those skilled in the art that the invention is not so limited, but is susceptible to various modifications and rearrangements in design and materials without departing from the spirit and scope of the invention. In particular, it should be noted that the present invention is subject to modification with regard to the assembly, materials, size, shape, and use set forth herein. For instance, there are numerous components described herein that can be replaced with equivalent functioning components to accomplish the objectives of the present invention.

What is claimed is:

1. A method of playing an enhanced hide and seek game using a seeker unit to search for an object having a transmitter unit, comprising the steps of:

    a. activating said transmitter unit associated with said object;

    b. placing said object in a hidden location;

    c. activating said seeker unit;

    d. transmitting a signal between said transmitter unit and said seeker unit;

J 0003

US 6,494,457 B2

9

e. determining a first distance between said seeker unit and said transmitter unit;

f. determining a second distance between said seeker unit and said transmitter unit;

g. comparing said second distance to said first distance to determine a change in distance and whether said second distance is greater or less than said first distance;

h. communicating a game message from said seeker unit to the game participant regarding said change in distance; and

i. repeating steps d through f until said object is found.

**2.** The method of claim **1** further comprising the step of communicating an initialization message from the seeker unit to the game participant after the step of activating said seeker unit.

**3.** The method of claim **1** further comprising the step of initiating a request on said seeker unit after determining said first distance.

**4.** The method of claim **1** further comprising the step of moving said seeker unit from a first position to a second position by the game participant prior to the step of determining said second distance.

**5.** The method of claim **4** further comprising the step of initiating a position request on said seeker unit after determining said first distance.

**6.** The method of claim **1** further comprising the step of communicating an end message from said seeker unit to the game participant prior to finding said object.

**7.** A method of playing an enhanced hide and seek game using a seeker unit to search for an object having a transmitter unit, comprising the steps of:

a. activating said transmitter unit associated with said object;

b. placing said object in a hidden location;

c. activating said seeker unit;

d. transmitting a signal between said transmitter unit and said seeker unit;

e. determining a first distance between said seeker unit and said transmitter unit;

f. moving seeker unit from a first position to a second position by the game participant prior to the step of determining said second distance;

g. initiating a position request on said seeker unit after determining said first distance;

h. determining a second distance between said seeker unit and said transmitter unit;

10

i. comparing said second distance to said first distance to determine a change in distance and whether said second distance is greater or less than said first distance;

j. communicating a game message from said seeker unit to the game participant regarding said change in distance; and

k. repeating steps d through j until said object is found.

**8.** The method of claim **7** further comprising the step of communicating an initialization message from the seeker unit to the game participant after the step of activating said seeker unit.

**9.** An enhanced hide and seek game, comprising:

an object capable of being hidden;

a transmitter unit associated with said object, said transmitter unit configured to transmit a signal generally outward from said object; and

a seeker unit associated with the game participant, said seeker unit having a receiver therein for receiving said signal from said transmitter unit; said seeker unit comprising a calculating means for determining a first distance between said seeker unit and said object, a second distance between said seeker unit and said object and a relative change in distance, said seeker unit further comprising a speaker for transmitting one or more messages to the game participant;

wherein after said object is hidden and said transmitter unit is activated, the game participant utilizes said seeker unit to find the location of said object by receiving said messages from said speaker.

**10.** The game of claim **9**, wherein said one or more messages comprises an indicator message indicating said relative change in distance.

**11.** The game of claim **9**, wherein said transmitter unit is inside said object.

**12.** The game of claim **9**, wherein said seeker unit is configured to be carried by the game participant.

**13.** The game of claim **9**, wherein said seeker unit further comprises an input means for receiving a position request from the game participant.

**14.** The game of claim **13**, wherein said input means comprises a voice activated sensor.

**15.** The game of claim **13**, wherein said input means comprises a manually operated switch.

* * * * *

J 0003 3

Form 30

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | February 7, 2014 |
by:

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means
    (by email or CM/ECF)

| Lenden F. Webb |                  | /s/ Lenden F. Webb |
| Name of Counsel |                 | Signature of Counsel |

Law Firm | WEBB & BORDSON, APC |

Address | 466 West Fallbrook Ave., Ste. 102 |

City, State, ZIP | Fresno, CA 93711 |

Telephone Number | (559) 431-4888 |

FAX Number | (559) 821-4500 |

E-mail Address | LWebb@WBLawGroup.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Form 19

**FORM 19.   Certificate of Compliance With Rule 32(a)**

---

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [          *11,954*          ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) **and the type style requirements of** Federal Rule of Appellate Procedure 32(a)(6).

☑     The brief has been prepared in a proportionally spaced typeface using
[                    *Microsoft Word 2011*                    ] in
[               *Times New Roman, Point 14 font*               ], or

☐     The brief has been prepared in a monospaced typeface using
[     *state name and version of word processing program*     ] with [
[     *state number of characters per inch and name of type style*     ].

/s/ Lenden F. Webb
_____
(Signature of Attorney)

Lenden F. Webb
_____
(Name of Attorney)

Attorney for Appellants, Shelly Conte and Cindy Reichman
_____
(State whether representing appellant, appellee, etc.)

February 7, 2014
_____
(Date)

Reset Fields